**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROGER W. MURRAY,<br>                    *Petitioner-Appellant*,<br><br>                    v.<br><br>DORA SCHRIRO, Warden,<br>                    *Respondent-Appellee*. | No. 08-99013<br><br>D.C. No.<br>2:03-CV-00775-DGC<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted
September 13, 2012—Las Vegas, Nevada

Filed March 17, 2014

Before: Johnnie B. Rawlinson, Jay S. Bybee,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Rawlinson

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel affirmed the denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder.

The panel affirmed the denial of relief as to petitioner's change of venue motion, including petitioner's contention that there is a heightened obligation to change venue in capital cases, because the state court's decision—that the substantial media coverage of this "sensational, small-town murder" was not constitutionally prejudicial—was not contrary to or an unreasonable application of Supreme Court precedent.

The panel affirmed the denial of relief as to petitioner's claim under *Batson v. Kentucky*, 476 U.S. 79 (1986), because the state court's decision that the prosecutor's race-neutral explanations for exercising peremptory challenges against two Hispanic potential jurors was not contrary or an unreasonable application of *Batson*.

The panel also affirmed the denial of relief as to petitioner's claim that he was denied due process based on a belated request for access to the sanitized crime scene.

The panel affirmed the denial of relief as to petitioner's request for jury instructions on voluntary intoxication

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

instruction and second degree murder, for lack of supporting evidence, because the state court's decision was consistent with Supreme Court precedent.

The panel held that the state court's rejection of petitioner's claim that the trial court erroneously applied a causal nexus test to evidence that petitioner's dysfunctional childhood could not be considered as an independent mitigating factor was not contrary to or an unreasonable application of Supreme Court precedent. The panel explained that the record reflects that the sentencing court "meticulously" weighed the mitigating and aggravating factors and employed the causal nexus test as a permissible means of weighing the entirety of the mitigating evidence prior to imposing sentence, and any error did not prejudice petitioner.

Finally, the panel held that the state court's denial of relief on petitioner's claims of ineffective assistance of counsel was not contrary to or an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984), and did not warrant a remand under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012). Petitioner claimed that he was denied his right to counsel due to an irreconcilable conflict, and that counsel was ineffective by sleeping during the trial and by failing to interview a critical witness who would have supported the defense theory that petitioner happened to be in the area where the murders were committed but did not commit them.

## COUNSEL

John E. Charland, The Charland Law Firm, Phoenix, Arizona, for Petitioner-Appellant.

Terry Goddard, Attorney General, Kent E. Cattani, Chief Counsel, Jeffrey A. Zick (argued), Assistant Attorney General, Capital Litigation Section, Phoenix, Arizona, for Respondent-Appellee.

## OPINION

RAWLINSON, Circuit Judge:

Petitioner-Appellant Roger Murray (Roger) appeals the district court's denial of his petition for habeas corpus challenging the death sentence imposed following his convictions for murder and armed robbery.

## I. BACKGROUND[1]

Dean Morrison (Morrison), age 65, and Jacqueline Appelhans (Appelhans), age 60, operated a store and restaurant in Grasshopper Junction, a rural area outside Kingman, Arizona. *See State v. Murray*, 906 P.2d 542, 553 (Ariz. 1995). On May 14, 1991, between 8:30 and 9:00 a.m., an acquaintance discovered the bodies of Morrison and Appelhans lying face down, in their bathrobes, after being shot multiple times in the head. *See id.* at 553–54.

---

[1] The facts are taken from the opinion of the Supreme Court of Arizona. *See State v. Murray*, 906 P.2d 542 (Ariz. 1995) (in banc).

At the crime scene, a revolver was found on the couch and a .22 caliber semiautomatic rifle was leaning against the wall. *See id.* at 554. Near the bodies were various .22 and .38 caliber bullets, as well as shotgun pellets. *See id.* Two weeks after the crime, Morrison's sister found a .25 caliber bullet in the pantry. *See id.*

In the living room, drawers were pulled out and the contents scattered. *See id.* The bedrooms and kitchen were also ransacked. *See id.* A .303 rifle was on a bed and $172 was on a desk chair. *See id.* Morrison's wallet containing $800 was undisturbed in his pants pocket. *See id.* The drawer from the cash register in the store had been removed, and the gas register was left on. *See id.* Morrison's glasses, a flashlight, and a set of keys were found on the patio of the store. *See id.* In addition, three live .38 caliber bullets were found near the gas pumps. *See id.*

Detective Lent of the Mohave County Sheriff's Department and another officer found and noted four sets of footprints, other than those of the investigating officers and the acquaintance who discovered the bodies. *See id.* Two sets of footprints belonged to the victims, a third set was made by tennis shoes, and the fourth set by western boots. *See id.* A different set of three footprints were made by the tennis shoes, the western boots, and Morrison's slippers. *See id.* Morrison's footprints indicated resistance by him. *See id.* At the time of their arrest, Roger was wearing tennis shoes and Robert was wearing western boots, both of which were consistent with the footprints analyzed at the crime scene. *See id.* at 553–54.

Morrison's autopsy revealed that he had suffered a shotgun blast that shattered his skull. *See id.* He also

suffered two gunshot wounds from a large caliber pistol. *See id.* at 554–55. A .38 caliber bullet was recovered from the back of his neck and large caliber buckshot was removed from his head. *See id.* at 555. Found next to Morrison was a fired .38 caliber bullet. *See id.* Morrison had lacerations and abrasions on his face, elbow, forearm, knee, and thigh. *See id.* The autopsy revealed that these injuries occurred at approximately the same time as the gunshot wounds. *See id.*

Appelhans was shot with at least three different guns. *See id.* A shotgun blast shattered her head. *See id.* Two .38 caliber slugs were removed from her skull. *See id.* She also suffered .22 caliber wounds that entered at the back of the neck and exited her face. *See id.* Aspiration hemorrhaging in her lungs indicated a lapse of time between the initial gunshot and death. *See id.* The shotgun blast was definitely lethal, and the .38 caliber bullets were also a possible cause of death. *See id.*

Before the bodies were discovered, police officers found one of Morrison's tow trucks abandoned on Interstate 40 westbound near Kingman, Arizona. *See id.* at 553. Roger and Robert were arrested on unrelated charges on Interstate 40 eastbound near Holbrook, Arizona. *See id.* The brothers were driving a Ford sedan with Alabama license plates. *See id.* at 554. When an officer attempted to stop the vehicle, the brothers fled, driving in excess of eighty-five miles per hour. *See id.* During their flight, the brothers breached a manned and armed roadblock. *See id.* The brothers stopped only after their vehicle ran off the road into a wash that impeded further progress. *See id.* Robert, the driver, threw a .38 revolver containing four bullets from the car. *See id.* Roger discarded a loaded .25 semiautomatic pistol. *See id.*

Additionally, Robert had two spent shotgun shell casings in his pants pocket. *See id.*

A loaded twelve gauge sawed-off shotgun and shotgun shells were discovered inside the car. *See id.* A checkered cushion cover that matched the cushion on Morrison's couch contained rolled coins stamped "Dean's Enterprises, Grasshopper Junction, Kingman, Arizona, 86401." *Id.* A blue pillow case contained approximately $1400 in coin rolls and $3300 in cash. *See id.* Gloves and a hotel receipt were also in the vehicle. *See id.* Records from the hotel indicated that the brothers had listed a Ford sedan, the description of which matched the vehicle they were driving at the time of their arrest, on the hotel registration card. *See id.* Officers retrieved from the sedan an atlas with circles around the locations of two rural establishments, the Oasis and Grasshopper Junction, which were not otherwise indicated on the map. *See id.*

Keys found in Robert's pants pocket were later identified as the keys to a pickup truck on Morrison's property. *See id.* A scanner and connecting knob in the sedan fit an empty bracket in the abandoned tow truck. *See id.* It was determined that the casings found at the crime scene and in Robert's pocket were fired from the guns possessed by Roger and Robert. *See id.* at 555.

Human blood and tissue were found on Robert's shirt, on Roger's pants, and on the cushion cover. *See id.* The blood on Roger's pants could have come from either victim or from Robert, but not from Roger. *See id.* The blood on Robert's shirt was consistent with that of either victim, but not with the blood of Roger or Robert. *See id.* The blood on the cushion cover could have come from Appelhans, but not from

Morrison or the Murrays.  *See id.*  No DNA tests were conducted.  *See id.*

The brothers were indicted for the first degree murders of Morrison and Appelhans and for the armed robbery of Morrison.  *See id.*  A jury convicted them of all charges.  *See id.*  The first degree murder verdicts were unanimous for both premeditated murder and felony murder.  *See id.*  After separate sentencing hearings, the trial court found that the state had proven three aggravating circumstances as to each defendant:  the murders were committed for pecuniary gain, as defined in A.R.S. § 13-703(F)(5);[2] the murders were especially heinous, cruel or depraved, as provided in § 13-703(F)(6);[3] and the defendants committed multiple

---

[2] A.R.S. § 13-703(F)(5) (1992) provided:

> Aggravating circumstances to be considered shall be the following:
>
> . . .
>
> (5) The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

[3] A.R.S. § 13-703(F)(6) (1992) provided:

> Aggravating circumstances to be considered shall be the following:
>
> . . .
>
> (6) The defendant committed the offense in an especially heinous, cruel or depraved manner.

homicides, as described in § 13-703(F)(8).[4] *See id.* Finding the mitigation evidence insufficient to outweigh the aggravating circumstances, the trial court denied leniency for both defendants and imposed a sentence of death. *See id.* The Arizona Supreme Court affirmed the convictions and sentences. *See id*.

## A. Direct Appeal - Robert and Roger

On October 26, 1995, the Arizona Supreme Court affirmed the convictions and sentences. *See id*. at 553. On direct appeal, the brothers raised five issues: (1) jury selection; (2) pretrial motions; (3) evidentiary issues; (4) motion for acquittal; and (5) special verdict form. *See id.* at 555–65. Roger raised five additional trial issues: (1) jury sequestration; (2) jury instructions; (3) request for mistrial; (4) prosecutorial misconduct; and (5) visitation of the crime scene. *See id.* at 565–69. In addition, Roger raised three sentencing issues: (1) objective standards and prosecutorial discretion; (2) independent review; and (3) aggravating factors. *See id.* at 569–71. Roger also raised issues related to the following statutory mitigation factors: (1) capacity to appreciate wrongfulness of conduct or conform conduct to requirements of the law, (2) relatively minor participation;

---

[4] A.R.S. § 13-703(F)(8) (1992) provided:

Aggravating circumstances to be considered shall be the following:

. . .

(8) The defendant has been convicted of one or more other homicides, as defined in § 13-1101, which were committed during the commission of the offense.

(3) age; (4) duress; and (5) no reasonable foreseeability that his conduct would create a grave risk of death. *See id.* at 573–77.

The Arizona Supreme Court also addressed the following nonstatutory mitigation factors that Roger raised during trial: (6) dysfunctional childhood and family relations; (7) medical treatment; (8) remorse; (9) drug and alcohol use; and (10) mental health. *See id.* at 577–78. For the first time on direct appeal Roger urged as mitigation factors: (11) education; (12) residual or lingering doubt; (13) felony murder instruction; and (14) cooperation. *See id.* at 578.

### 1.  *Jury Selection*

The original master jury list used was composed of a one-and-a-half-year-old driver's license list in violation of Arizona law. *See id*. at 555.  Just days before trial was scheduled to begin, the trial court ordered that a new jury list be created using both the old driver's license list and a list of registered voters. *See id*.  The jury commissioner advised the trial court that the new list would generate adequate potential jurors by the date of trial, even though the deadline to respond was beyond the date trial was scheduled to begin. *See id*. Robert and Roger argued that (1) the truncated time to respond to the jury questionnaire resulted in fewer potential jurors from more remote portions of the county; and (2) the one-and-a-half-year-old driver's license list resulted in fewer young prospective jurors. *See id*.  Robert and Roger contended that these infirmities denied them a jury of their peers because they hailed from a small, rural area in Alabama and were young at the time of trial. *See id*. at 555–56. The Arizona Supreme Court concluded that Robert and Roger failed to establish the lack of a fair and impartial jury or

prejudice. *See id.* The brothers failed to show that they were denied the right to have jurors selected from a fair cross-section of the community, or systematic exclusion of any discrete segment of the community. *See id.* at 556. The court noted that "failure to follow statutory procedures is harmless, absent some separate showing of prejudice or discrimination . . . ." *Id.*

The brothers also contended that the jury commissioner's use of standardless exclusions violated their constitutional rights. *See id.* However, the Arizona Supreme Court determined that the jury commissioner, within her discretion, excused and notified potential jurors in accordance with state law. *See id.* at 557. The court concluded that the brothers were not denied their right to a jury drawn from a fair cross–section of the community, because the criteria used were neutral and did not "constitute systematic exclusion." *Id.* (citation omitted).

Finally, Robert and Roger asserted a *Batson*[5] violation when the prosecution used peremptory challenges to dismiss the only two Hispanic potential jurors. *See id.* at 557-58. The Arizona Supreme Court rejected the *Batson* challenge, concluding that the trial court's acceptance of the prosecutor's race-neutral explanation for striking the Hispanic jurors was not an abuse of discretion. *See id.*

---

[5] *Batson v. Kentucky*, 476 U.S. 79 (1986).

## 2. *Pretrial Motions*

### a. Severance

The Arizona Supreme Court concluded that the trial court did not abuse its discretion in declining to sever the brothers' cases. *See id.* at 558. The court noted that "joint trials, are the rule rather than the exception . . . ." *Id.* (citation omitted). The court also pointed out that the crimes were so intertwined that it would have been virtually impossible to sever the evidence, because the evidence implicated the brothers equally. *See id.* The jury questionnaire screened out prospective jurors who would have trouble segmenting the evidence, and the trial court instructed the jury to consider the evidence separately against each defendant. Under these circumstances, the Arizona Supreme Court found no prejudice. *See id.*

### b. Change of Venue

The Arizona Supreme Court determined that Robert and Roger failed to prove presumed or actual prejudice based on the denial of their request for a change of venue due to pretrial publicity. *See id.* at 559. The Court emphasized that the brothers failed to show any pretrial publicity that was so outrageous that the trial was "utterly corrupted." *Id.* (citation omitted). Any security measures were largely effectuated when jurors were unlikely to be present. *See id.* Only prospective jurors who pledged to decide the case solely on the evidence were empaneled, and empaneled jurors were repeatedly admonished to avoid media coverage. *See id.* After reviewing this record, the Arizona Supreme Court affirmed the trial court's denial of the requested venue change. *See id.*

c.  Hybrid Representation

After noting that there is no right to hybrid representation (some combination of self-representation and counsel), the Arizona Supreme Court held that the trial court acted within its discretion when it denied the brothers' requests for hybrid representation in the absence of irreconcilable conflict or incompetent counsel.  *See id.* at 560.

d.  Library Access

Citing *Bounds v. Smith*, 430 U.S. 817 (1977), the Arizona Supreme Court held that because the brothers were provided with counsel throughout the proceedings, their constitutional right to access the court was afforded, regardless of whether they were able to personally access legal materials.  *See id.* at 561.

3.  *Evidentiary Issues*

The brothers challenged the admissibility of crime scene photographs and footprint comparisons, and argued that the court improperly prevented them from impeaching a witness. *See id.* at 561–64.  The Arizona Supreme Court determined that the challenged photographs were relevant to the case and were not unduly inflammatory.  *See id.* at 561–62.  The court also rejected the challenge to footprint comparisons made by a detective, holding that the trial court did not abuse its discretion in qualifying the detective as an expert where the detective had extensive tracking experience in criminal investigations and had previously been qualified as an expert in state and federal court.  *See id.* at 562–63.  Any issue of proper methodology "went to the weight rather than admissibility."  *Id.* at 563 (citation omitted).

Finally, the brothers contended that the trial court impermissibly precluded impeachment of the detective who testified regarding the footprint evidence. *See id.* at 563–64. During cross-examination, the detective admitted that he had previously lied under oath. *See id.* at 563. After hearing argument in chambers, the trial court determined that the relevant extrinsic evidence of the detective's truthfulness (or lack thereof) was minimally probative, but far outweighed by its prejudicial and confusing nature. *See id.* The trial court was of the view that admission of the extrinsic evidence to impeach the detective would essentially result in the trial of a collateral matter. *See id.* at 563–64. The Arizona Supreme Court concluded that the trial court did not abuse its discretion in applying the Arizona Rules of Evidence. *See id.* at 564.

### 4. *Motion for Acquittal*

Robert and Roger moved for acquittal, arguing that there was not substantial evidence to support a conviction. *See id.* at 564. The Arizona Supreme Court concluded that there was substantial evidence supporting the robbery and felony murder convictions, including signs of a struggle, to establish that the defendants used force to rob the victims. *See id.* The court also clarified that the prosecution did not need to establish that Roger killed or intended to kill to prove felony murder under Arizona law. *See id.* at 564-65. Rather, the prosecution need only establish that a principal or accomplice attempted to commit or committed a robbery and a person was killed during the commission of and in furtherance of the robbery. *See id.* at 565.

Further, the court affirmed the existence of substantial evidence supporting the convictions for first-degree murder,

namely evidence establishing that Robert and Roger were present at the crime scene and participated in the crimes, including evidence from the crime scene found on the brothers and the execution-style murders. *See id.*

Finally, the Arizona Supreme Court held that the trial court issued a special verdict that was in the record, as required by law, although not specifically titled "Special Verdict." *Id.*

## B. Direct Appeal - (Trial Issues)

### 1. *Jury Sequestration*

Although the trial court denied Roger's motion to sequester the jury, the jury was repeatedly admonished to avoid media coverage. *See id*. at 566. Roger failed to assert or establish that the jurors failed to follow the trial court's admonitions. *See id.* The Arizona Supreme Court concluded that the trial court did not abuse its discretion when it denied the sequestration request. *See id.*

### 2. Willits *Jury Instruction*[6]

The Arizona Supreme Court concluded that the evidence Roger asserted that the state failed to preserve, such as the types of shoes worn by others at the crime scene and fast-food remnants, would not have tended to exonerate him. *See*

---

[6] *State v. Willits*, 393 P.2d 274, 276, 279 (Ariz. 1964) (in banc), requires a jury instruction when the state destroys material evidence that would allow the jury to infer that the facts implicated by the material evidence are against the state's interest.

*id.* Therefore, the trial court acted within its discretion when it denied the requested *Willits* instruction. *See id.*

### 3. *Intoxication Instruction*

Roger asserted that he was entitled to an intoxication instruction, because on the night of the murders, he and Robert had been drinking at a local bar. *See id.* However, the manager of the bar testified that the brothers were "handling themselves very well." *Id.* In view of the trial court's finding that there was no evidence that alcohol consumption affected the brothers' "ability to think, function, or form intent," the Arizona Supreme Court concluded that Roger failed to meet his burden of showing that consumption of alcohol negated an element of the crime. *Id.* at 566–67 (citations omitted).

### 4. *Second-Degree Murder/Lesser Included Offense Instruction*

The Arizona Supreme Court explained that an instruction on second-degree murder would pertain, if at all, only to the premeditated murder count and only if supported by the evidence. *See id.* at 567. Due to the substantial evidence of premeditation in the record, the Arizona Supreme Court agreed with the trial court that an instruction on second-degree murder was contraindicated because the jury could have only rationally drawn the inference that Robert and Roger premeditated the murders. *See id.*

### 5. *Request for a Mistrial*

Roger's request for a mistrial stemmed from witness statements referring directly or indirectly to his in-custody status. *See id.* at 567. The Arizona Supreme Court concluded

that the jurors were already aware that the brothers had been arrested and were in custody at some point prior to trial. The court ruled that such knowledge was not prejudicial and did not deprive the brothers of their right to a presumption of innocence. *See id.* at 568.

### 6. *Prosecutorial Misconduct*

Roger alleged the following instances of misconduct:

(1) A detective's joking about the Federal Bureau of Investigations [FBI] while testifying. The objection to the FBI comment was sustained based on irrelevance and the jury was instructed to disregard it.

(2) Discussion by officers in the courthouse library that defendants were using the "fecal defense"-throwing up anything and hoping something sticks. The trial court thoroughly probed this issue and concluded that there had been no discussion of the evidence and that the jurors were unlikely to have heard the discussion.

(3) The prosecutor's alleged joking with a witness in front of the jury about whether a bartender at the Temple Bar had gone fishing in Mexico. Defendant waived this issue for failure to object at trial. *See State v. White*, 564 P.2d 888, 892 (Ariz. 1977).

(4) The prosecutor's joking with someone while on a cigarette break about being

subpoenaed, while two jurors stood nearby. The prosecutor himself brought the incident to the court's attention; neither defendant objected [n]or moved for a mistrial in the trial court. Thus, defendant waived this issue.

(5) In closing argument, the prosecutor's referring to defendants as "the boys from Alabama." Defendant waived this issue by failing to object at trial. *See State v. Hankins*, 686 P.2d 740, 747 (Ariz. 1984).

(6) The prosecutor's stating that a .25 caliber bullet found on the premises had been fired by one of the brothers. The argument was permissible because a ballistics expert found that the bullet matched the pistol Roger threw from the car.

(7) Reference in closing argument by the state to defendants feeling a "sick excitement" in committing the murders. The trial court cautioned the prosecutor and the prosecutor made no more such references.

*Id.*

The Arizona Supreme Court determined that the prosecutor's conduct did not negatively influence the trial because Roger failed to establish that the prosecutor's actions affected the jury's verdict in any way. *See id.*

### 7. *Visitation of the Crime Scene*

The Arizona Supreme Court determined that the trial court did not abuse its discretion by denying Roger's request to revisit the crime scene. *See id*. at 569. On the fourth day of trial, more than a year after the crime was committed, Roger filed a motion to revisit the crime scene. *See id*. (citing Ariz. R. Crim. P. 15.1(e)). The trial court denied the motion because Roger had failed to show a substantial need for the second inspection. *See id*. Roger's attorney had previously examined the crime scene with investigators, and the attorney and investigators were still available. Additionally, the crime scene had been cleaned. *See id.*

### C. Direct Appeal - (Sentencing Issues)

#### 1. *Objective Standards and Prosecutorial Discretion*

The Arizona Supreme Court noted that Roger's arguments regarding the alleged lack of objective standards for imposing the death penalty and the broad discretion afforded the prosecution in seeking the death penalty had been rejected in previous cases. *See id.* (citing *State v. Salazar*, 844 P.2d 566, 578 (Ariz. 1992) (in banc); *State v. Correll*, 715 P.2d 721, 737 (Ariz. 1986) (in banc); *State v. Harding*, 670 P.2d 383, 397 (Ariz. 1983) (in banc)).

#### 2. *Independent Review*

The Arizona Supreme Court explained that it conducts an independent review of death sentences for error, determines whether the aggravating circumstances were proven beyond a reasonable doubt, considers mitigating circumstances, and weighs the aggravating factors and the mitigating

circumstances anew to decide whether leniency is warranted. *See id.*

### 3. *Aggravating Factors*

Roger challenged all three of the following aggravating factors found by the trial court:

> A.    Defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. A.R.S. § 13-703 (F)(5).

> B.   Defendant committed the offense in an especially heinous, cruel, or depraved manner. A.R.S. § 13-703 (F)(6).

> C.   Defendant has been convicted of one or more other homicides which were committed during the commission of the offense.  A.R.S. § 13-703 (F)(8).

*Id.*

The Arizona Supreme Court concluded that there was substantial evidence to establish that Roger committed the crime for pecuniary gain, *i.e.,* that there was financial motivation. *See id.*  Among other evidence, a number of items, including cash were taken. *See id*. at 569–70.  The record also supported a finding that the crimes were especially heinous, cruel, or depraved. *See id.* at 570.  The victims were kidnapped at gunpoint, were taken by surprise, and were aware of their imminent demise. *See id.*  The signs of struggle and fear, *e.g.*, Appelhans clutching Morrison's

arm, established mental anguish as well as pain and suffering. *See id.* Finally, the elderly, helpless victims were subjected to gratuitous violence and the murders were senseless. *See id.* at 571.

### 4. *Multiple Murders*

Citing its precedent, the Arizona Supreme Court rejected Roger's argument that double jeopardy foreclosed application of the multiple homicide aggravating factor where the murders were part of the same criminal offense. *See id.* (citing *State v. Glenway*, 823 P.2d 22, 34–35 (Ariz. 1991) (in banc)).

### 5. *Mitigating Circumstances*

The Arizona Supreme Court reviewed and addressed the following mitigating circumstances presented by Roger:

> a. *Capacity to Appreciate Wrongfulness of Conduct or Conform Conduct to Requirements of the Law*

After discussing Roger's juvenile problems, head injuries, hyperactivity, and substance abuse, the Arizona Supreme Court determined that Roger failed to establish that these factors, either individually or in combination, affected his capacity to appreciate the wrongfulness of his conduct or to confirm his conduct to the requirements of the law. *See id.* at 573–76.

### b.  *Relatively Minor Participation*

Roger asserted that Robert's jailhouse letters to him, in which Robert admitted participating in the killing of Morrison and Appelhans, exculpated him.  Roger also referenced the lack of evidence establishing that he fired any of the guns.  *See id*. at 576.  The Arizona Supreme Court disagreed, referencing evidence at trial implicating both Robert and Roger, including footprint evidence, the fact that both defendants were armed when captured, and the fact that the victims suffered numerous bullet wounds from different weapons. *See id.*  Additionally, the Court noted that Robert's jailhouse letters did not "indicate the role Roger did or did not play."  *Id*.  The Court determined that Roger failed to prove by a preponderance of the evidence that his role in the crimes was minor.  *See id.*

### c.  *Age - (Twenty Years Old)*

The Arizona Supreme Court rejected Roger's reliance on his relative youth as a mitigating factor.  The Court reasoned that Roger's intelligence, previous criminal history, experience with law enforcement, the extent of his involvement with the crimes, and the deliberate nature of the murders militated against concluding that the commission of the crimes was due to a lack of maturity.  *See id.* at 576–77.  In sum, Roger failed to prove "how his age impaired his judgment in committing the crimes."  *Id.* at 577 (citation omitted).

### d. *Duress*

The Arizona Supreme Court concluded that Roger was not under duress from Robert and had failed to show that his desire to please his brother rose to the level of duress. *See id.*

### e. *No Reasonable Foreseeability that Conduct Would Create a Grave Risk of Death*

According to the Arizona Supreme Court, Roger's asserted immaturity, dependent personality, and idolizing of his brother, even if true, would not negate the foreseeability that use of guns to commit a robbery would create a grave risk of death. *See id.*

### f. *Dysfunctional Childhood and Family Relations*

Although Roger established that his childhood was dysfunctional, the Arizona Supreme Court concluded that "[a] difficult family background alone is not a mitigating circumstance." *Id*. (citation omitted). The court held that "[f]amily background is a mitigating circumstance only if a defendant can show that something in that background had an effect or impact on his behavior that was beyond the defendant's control." *Id*. (citation omitted). In sum, the court concluded that the fact of Roger's dysfunctional childhood was not a mitigating circumstance because "he fail[ed] to show how [his] background impacted his behavior at Grasshopper Junction." *Id*.

### g.  *Medical Problems*

The Arizona Supreme Court found "nothing mitigating in connection with [Roger's] claimed alleged medical problems as a child." *Id.* at 578.

### h.  *Remorse*

The Arizona Supreme Court concluded that Roger failed to establish that he was remorseful, noting specifically Roger's letter to the trial judge, written just prior to the aggravation/mitigation hearings, that denied responsibility for the crimes. *See id.*

### i.  *Drug and Alcohol Use*

The Arizona Supreme Court found that Roger's alcohol and drug use were not mitigating because the substance abuse was self-reported and largely uncorroborated, and because the physical activity at the crime was inconsistent with sensory impairment. *See id.*

### j.  *Mental Health*

The Arizona Supreme Court determined that Roger's mental health issues, including hyperactivity and potentially other mental disorders, were entitled to "some nonstatutory mitigating weight." *Id.* However, the court concluded that Roger "fail[ed] to prove that he suffer[ed] from brain damage." *Id.*

### k. *Education*

The Arizona Supreme Court rejected Roger's argument that because he became a paralegal despite having dropped out of high school, he was able to "reside within our society and abide by the rules . . ." *Id*. The Court noted that Roger's accomplishments did not prevent commission of the heinous crimes against Morrison and Appelhans. *See id.*

### l. *Residual or Lingering Doubt*

The Arizona Supreme Court concluded that there was no lingering doubt regarding Roger's actual participation in the crime. *Id.*

### m. *Felony Murder Instruction*

The Arizona Supreme Court explained that a felony murder instruction "can only be mitigating where there is some doubt regarding defendant's specific intent to kill. . . ." *Id*. (citation omitted). Because there was a premeditation finding, Roger's specific intent was not in doubt. *See id*.

### n. *Cooperation*

Roger complained that the trial court failed to take his cooperation into consideration. *See id.* Roger relied on the fact that he refrained from shooting the police officer who apprehended him. *See id.* The Arizona Supreme Court held that refraining from killing one more person cannot possibly demonstrate cooperation as a mitigating factor. *See id.*

### 6. *Weighing Aggravation and Mitigation*

The Arizona Supreme Court described the "very detailed special verdicts" completed by the trial court and concluded that the record reflected careful consideration of all the evidence and careful weighing of the mitigating and aggravating factors. *See id.* at 579.

### 7. *State's Rebuttal Evidence*

Roger contended that the trial court improperly allowed the admission of evidence supporting the aggravating factors after the defense had rested its mitigation case. *See id.* However, the Arizona Supreme Court concluded that the state was entitled to call witnesses to rebut the mitigation evidence presented by Roger. *See id.* Regardless, the Arizona Supreme Court determined that the trial court had carefully reviewed the mitigating evidence, and "[t]here [wa]s no suggestion in the record that the [trial] judge considered the rebuttal evidence in connection with anything but mitigation. *Id.*

## D. Post-Conviction Proceedings

Following his unsuccessful direct appeal, Roger filed a petition for post-conviction relief (PCR). Roger asserted that he had a genuine and irreconcilable conflict with his trial counsel and the trial court's refusal to appoint new trial counsel was an abuse of discretion that effectively denied Roger's right to counsel. Roger also advanced ineffective assistance of counsel (IAC) claims alleging: (1) trial counsel's sleeping during substantial portions of the trial; (2) trial counsel's failure to present the testimony of Jack Potts, M.D. at the mitigation hearing; (3) trial counsel's

failure to obtain neurological or neuropsychological evaluations of Roger prior to sentencing; (4) trial counsel's failure to call an exculpatory witness; (5) trial counsel's ignorance of rehabilitation as a mitigating factor; (6) trial counsel's failure to properly pursue a discovery violation by the prosecution; (7) trial counsel's failure to properly discredit the detective who provided footprint testimony; and (8) trial counsel's calling of witnesses who were prejudicial to the defense. Roger's remaining claims challenged the trial court's construction of nonstatutory mitigating evidence and the constitutionality of Arizona's death penalty system.

Following a hearing pursuant to Rule 32 of the Arizona Rules of Criminal Procedure, the PCR court set an evidentiary hearing for the claims asserting ineffective assistance of counsel for sleeping and for failing to obtain a neurological or neuropsychological examination. The balance of the claims were deemed precluded or were summarily rejected.

The PCR court appointed a psychologist and neuropsychologist to evaluate Roger prior to the evidentiary hearing. Following the evidentiary hearing, the PCR court denied relief on the IAC claim asserting that counsel slept throughout major portions of the trial.[7]

The Arizona Supreme Court summarily denied Roger's subsequent petition for review, except as to Roger's claim

---

[7] After being examined by the court appointed psychologists, Roger notified the PCR court that he did not intend to rely on those experts. Subsequently, the State filed a motion to dismiss Roger's IAC claim for trial counsel's failure to obtain a neurological or neuropsychological examination, which the PCR court granted.

that he was entitled to a jury determination of the aggravating factors. Review of that claim was consolidated with the claims of other similarly situated inmates, and relief was denied. *See State v. Towery*, 64 P.3d 828 (Ariz. 2003) (en banc). Roger filed a petition for writ of certiorari to the United States Supreme Court, which he later withdrew. Roger then filed a habeas petition in the federal district court.

### E. Federal Habeas Petition

The fifty-six claims in Roger's federal habeas petition largely mirrored those raised in Roger's direct appeal. *See Murray*, 906 P.2d at 553–78.

Roger voluntarily withdrew the following nine claims as duplicative:

- Claim 43 (trial court's failure to file a written special verdict);

- Claim 47 (IAC - failure to obtain neurological and neuropsychological evaluation);

- Claim 49 (IAC - failure to follow-up on objection to disclosure violations);

- Claim 50 (IAC - failure to discredit footprint expert);

- Claim 51 (IAC - called witnesses prejudicial to defense);

- Claim 52 (denial of sentencing jury);

- Claim 54 (arbitrary imposition of the death penalty);

- Claim 55 (cruel and unusual punishment); and

- Claim 56 (nondeterrence of execution).

The district court dismissed the following claims as procedurally barred:

- Claim 8 (footprint evidence);

- Claim 9 (impeachment of footprint expert);

- Claim 20 (viability of aggravating factors);

- Claim 21 (application of aggravating factors);

- Claim 23 (lack of funding for additional experts);

- Claim 24 (unconstitutionality of death penalty);

- Claim 25 (unconstitutionality of death penalty);

- Claim 26 (unfair balancing of aggravating and mitigating factors);

- Claim 27 (vagueness of heinous, cruel or depraved aggravating factor);

- Claim 28 (lack of meaningful review of sentence);

- Claim 29 (limitation on nonstatutory mitigation evidence);

- Claim 30 (IAC -failure to impeach footprint expert);

- Claim 31 (IAC - failure to move for severance);

- Claim 32 (IAC - failure to secure experts);

- Claim 33 (IAC - failure to prepare for Aggravation/Mitigation Hearing);

- Claim 35 (violation of rights under International Law);

- Claim 36 (physical and psychological torture during execution);

- Claim 39 (improper consideration of evidence regarding aggravating factors);

- Claim 44 (irreconcilable conflict with attorney);

- Claim 46 (IAC - failure to call mental health expert); and

- Claim 53 (failure to channel sentencing discretion).

*District Court Discussion of Claims on the Merits*

Claim 1 - *Change of Venue*

The district court determined that the Arizona Supreme Court's decision denying relief was not contrary to or an unreasonable application of Supreme Court precedent, nor was it based on an unreasonable determination of the facts. The district court referenced the two types of prejudice resulting from pretrial publicity-presumed prejudice and actual prejudice. Because Roger did not argue actual

prejudice, the district court focused on presumed prejudice, albeit noting that the Arizona Supreme Court's decision rejecting actual prejudice was not contrary to or an unreasonable application of Supreme Court precedent. The district court acknowledged that presumed prejudice is established when pretrial publicity utterly corrupts the trial atmosphere or incites a public passion that makes a fair trial unlikely.

While the district court recognized that this case garnered significant media attention, it determined that the nature of the press coverage was not unduly pervasive or inflammatory. Rather, the media reports were factual recitations of the crime and the ensuing criminal proceedings. The district court therefore concluded that the Arizona Supreme Court did not unreasonably apply clearly established federal law in rejecting Roger's claim of presumed prejudice, and that the state court's decision was not based on an unreasonable determination of the facts.

Claim 2 - *Jury Sequestration*

The district court noted that because there is no constitutional right to jury sequestration, to obtain habeas relief, Roger was required to show that he was prejudiced by the failure to sequester the jury.

The occurrences referenced by Roger to support his claim of prejudice included the security measures in effect during trial, negative comments made by police officers outside the courtroom, a conversation involving the prosecutor that may have been overheard by two jurors, and the attendance at trial of a juror's spouse. The district court relied on the evidence presented to the state trial court that no jurors were exposed

to the officers' comments, that the jurors were admonished to disregard any comments by the prosecutor during the break, and that the juror and his spouse did not discuss the case. Because the state court's determination that Roger failed to establish prejudice withstood AEDPA review, the district court denied habeas relief on this claim.

Claim 3 - *Severance*

The state court's conclusion that Roger failed to establish prejudice from the joint trial, the district court held, was not based on an unreasonable application of clearly established federal law or an unreasonable determination of the facts. There was no indication that the defenses were antagonistic or mutually exclusive. Neither brother testified and no inculpatory statements were introduced. The nature and effect of the overwhelming evidence, which was admissible against both brothers, would not have changed if the trial were severed. The district court thus concluded that this claim was without merit, and denied relief.

Claim 4 - *Jury Selection Process*

The district court rejected this claim because Roger failed to demonstrate that young people or persons living in rural areas are distinctive groups as is required to establish underrepresentation or exclusion of a cognizable group from the jury selection process. The Arizona Supreme Court had rejected this claim on the basis of *Duren v. Missouri*, 439 U.S. 357 (1979). Because Roger could not show that either *Duren* or any other clearly established Supreme Court authority recognized young people or people living in rural areas as distinctive groups for fair-cross section purposes, the

district court concluded that the state court had not unreasonably applied clearly established federal law.[8]

### Claim 5 - *Fair Cross-Section/Equal Protection*

The district court determined that, as with Claim 4, the Arizona Supreme Court did not unreasonably apply United States Supreme Court precedent by concluding that Roger failed to establish that a distinctive group was improperly excluded from the jury pool.

### Claim 6 - Batson

The state court's determination that the prosecutor's reasons for striking each of the challenged jurors were race-neutral, the district court concluded, was valid under AEDPA. One juror was excused due to the state's criminal investigation of her relatives and the other juror was excused because the prosecutor knew the juror socially and was concerned that he might be too willing to agree to avoid discord. The district court determined that the Arizona Supreme Court neither unreasonably applied *Batson* nor based its decision on an unreasonable determination of the facts in the record.

---

[8] In *Duren*, the United States Supreme Court held that a defendant in a criminal case has a Sixth Amendment right to a jury pool that constitutes a fair cross-section of the community. *See Duren*, 439 U.S. at 359–60. This constitutional right is violated only if a distinctive group is excluded from jury service. *See id.* at 364.

Claim 7 - *Revisiting the Crime Scene*

The district court determined that Roger did not establish prejudice due to the trial court's denial of his request to revisit the crime scene more than a year after the crime was committed and after the crime scene had been cleaned.  The district court concluded that Roger failed to show that the evidence sought was material or that the verdict would have been different, particularly in view of the overwhelming evidence of guilt.  The district court denied relief on this claim, affirming the state court's determination under AEDPA.

Claim 10 - *Hybrid Representation*

The district court concluded that the Arizona Supreme Court's decision denying Roger's hybrid representation claim was not contrary to or an unreasonable application of Supreme Court precedent.  Roger did not assert that the state court's ruling violated his constitutional rights in any particular fashion.  Additionally, the district court observed that Roger failed to cite any clearly established law supporting his claim of entitlement to hybrid representation. The district court denied relief on this claim.

Claim 11 - *Gruesome Photographs*

The district court found that Roger was not prejudiced by the photographs of the victims and of the crime scene that were admitted into evidence.  The court reasoned that even if the pictures were improperly admitted, the error was not prejudicial and did not rise to the level of a due process violation because the evidence against Roger was overwhelming.  The district court denied relief, concluding

that the state court's determination was neither contrary to, nor an unreasonable application of, clearly established federal law.

Claim 12 - *Prosecutorial Misconduct*

The district court determined that a detective's joking about the FBI while testifying, when viewed in the context of the entire proceedings, "was innocuous and could have had no effect on the fairness of the trial," particularly since the jury was instructed to disregard the offending comments. The district court also determined that the prosecutor's statement during closing argument tying the .25 caliber shell found at the crime scene to Roger was a permissible inference that the prosecutor was allowed to draw based on the evidence. Regarding the prosecutor's reference to the brothers as the "boys from Alabama" during closing argument, the district court determined that the "prosecutor's use of this rhetorical device did not carry the connotations [Roger] ascribe[d] to it and did not deprive him of a fair trial."

Finally, the district court determined that the comments made by the prosecution "that the defendants experienced a 'sick excitement' and 'some sick crazy high'" as they committed the crimes did not result in a due process violation. The trial court neutralized any inappropriateness by instructing the jury not to be influenced by passion or prejudice, and that statements of counsel are not evidence. The district court denied relief because it determined that the Arizona Supreme Court did not unreasonably apply clearly established federal law holding that inappropriate remarks must infect the trial with unfairness to warrant reversal.

Claim 13 - *Reference to In-Custody Status*

Roger objected and moved for a mistrial after reference was made to blood being drawn from Roger by a "nurse in jail." Another reference was made to the fact that Roger's clothing was taken while he was in custody. The trial court sustained the objection to the testimony regarding blood being drawn and struck the answer. Roger's motion for a mistrial was denied.

The district court agreed with the state court that these isolated references to Roger's in-custody status did not warrant a mistrial. The district court concluded that relief was not warranted under *Estelle v. Williams*, 424 U.S. 501 (1976), and Roger cited no Supreme Court case supporting the proposition that the mere mention of the fact that a defendant is in custody constitutes a due process violation. Accordingly, the district court denied relief on this claim under AEDPA.

Claim 14 - *Sufficiency of Evidence*

Roger challenged the sufficiency of evidence supporting his armed robbery and felony murder convictions. The district court found that the state court did not unreasonably apply clearly established federal law, *Jackson v. Virginia*, 443 U.S. 307 (1979), in concluding that a rational factfinder could determine from the evidence that Roger committed armed robbery and that the deaths of the victims occurred during the course of or in furtherance of the armed robbery. Nor was the state court's conclusion an unreasonable determination of the facts, given the use of several weapons, evidence of a struggle, and the fact that property was taken. The district court, therefore, denied relief on this claim.

Claim 15 - *Jury Instruction Addressing the State's Failure to Preserve Evidence*

Roger alleged that the trial court violated his rights by failing to give a jury instruction regarding the state's failure to preserve evidence. The district court opined that Roger had failed to establish that the officers who conducted the investigation acted in bad faith with respect to gathering, preserving, and analyzing the evidence. The witnesses for the state all gave credible explanations for the methods used to gather and preserve evidence, showing at most negligence on the part of investigators. More importantly, Roger failed to establish that the exculpatory nature of any unpreserved evidence was apparent before it was destroyed, or that the evidence was material. Because the state court did not unreasonably apply clearly established federal law in rejecting this claim, *see California v. Trombetta*, 467 U.S. 479, 488 (1984), the district court denied relief under AEDPA.

Claim 16 - *Intoxication Instruction*

The district court determined that Roger was not denied a fair trial when the trial court declined to give an intoxication instruction to the jury. The trial court found, and the Arizona Supreme Court affirmed, that Roger was drinking at a bar prior to the murders, but that there was no evidence that he was in fact intoxicated. Reviewing the state court decision under AEDPA, the district court presumed that finding to be correct and concluded that Roger had not overcome that presumption of correctness with clear and convincing evidence. The district court thus denied this claim.

Claim 17 - *Lesser Included Offense Instruction*

The district court found that the state court properly applied Supreme Court precedent, *Hopper v. Evans*, 456 U.S. 605, 611 (1982), in concluding that there was insufficient evidence in the record to persuade a rational factfinder that Roger committed second degree murder rather than first degree murder, thereby necessitating a lesser included offense jury instruction. The district court also noted that the evidence of premeditation was overwhelming.

Claim 18 - *Unconstitutionality of Arizona's Felony Murder Statute*

The district court determined that there is no clearly established federal law holding that a felony murder statute must include lesser offenses. Citing *Hopkins v. Reeves*, 524 U.S. 88, 96–97 (1998), the district court determined that Supreme Court precedent was to the contrary.[9] The district court denied this claim.

Claim 19 - *Unconstitutionality of Sentence Imposition by Judge Under State Law*

The district court denied this claim as foreclosed by *Schriro v. Summerlin*, 542 U.S. 348, 358 (2004), which held that the Supreme Court's decision in *Ring v. Arizona*,

---

[9] In *Hopkins*, the United States Supreme Court held that there is no requirement to give an instruction for second degree murder when the defendant is charged with capital felony murder, unless second degree murder is a lesser included offense of felony murder under state law. 524 U.S. at 94–97.

536 U.S. 584 (2002), requiring jury sentencing in capital cases, was not retroactive.

Claim 22 - *Double Jeopardy*

Roger took the position that applying the aggravator for multiple victims subjected him to double jeopardy. The district court explained that Roger was not being punished twice for the same crime. Rather, there were two crimes, two convictions, and two sentences. Citing *Poland v. Arizona*, 476 U.S. 147, 156 (1986), and *Lowenfield v. Phelps*, 484 U.S. 231, 244–46 (1988), the district court clarified that statutory aggravating factors are not offenses for double jeopardy purposes, but are used to guide the jury in determining an appropriate sentence in capital cases. The district court concluded that the Arizona Supreme Court's decision on this issue was not contrary to or an unreasonable application of clearly established federal law on double jeopardy.

Claim 34 – *Lack of Legitimate Penological Purpose Served by Delayed Execution*

The district court denied this claim as a matter of law because the United States Supreme Court has not determined that a lengthy incarceration prior to execution constitutes cruel or unusual punishment. The district court also observed that several circuit courts, including the Ninth Circuit, have held that prolonged incarceration prior to execution does not violate the Eighth Amendment. *See, e.g.*, *McKenzie v. Day*, 57 F.3d 1493, 1493–94 (9th Cir. 1995) (en banc).

Claim 37 – *Incompetence at Time of Execution*

Roger asserted that he would be incompetent at the anticipated time of execution.  The district court dismissed this claim without prejudice as premature, with consent of the parties.

Claim 38 - *Access to the Law Library*

The district court found that the Arizona Supreme Court did not unreasonably apply clearly established federal law when it decided that Roger was provided adequate assistance from persons trained in the law, satisfying his constitutional right of access to the courts.  The district court ruled that the state court's ruling was consistent with *Bounds*, 430 U.S. at 828, which held that constitutional access to the courts is satisfied by access to a law library or adequate assistance from a person trained in the law.

Claims 40/41 - *Statutory and NonStatutory Mitigation Evidence Outweighing Aggravating Factors*

The district court dismissed the portion of these claims asserting violations of the Fifth, Sixth, and Seventh Amendments as procedurally barred.  The district court also denied relief on the portion of Roger's claim asserting under the Eighth and Fourteenth Amendments, that the sentencing court failed to properly weigh aggravating and mitigating factors.  The district court determined that this was an asserted error of state law, and thus no federal habeas relief was available.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Claim 42 - *Unconstitutional Breadth of Prosecution's Discretion to Seek the Death Penalty*

The district court denied this claim because no clearly established Supreme Court precedent requires that a state provide specific standards instructing a sentencing court or jury regarding how to weigh aggravating and mitigating evidence. *See Ortiz v. Stewart*, 149 F.3d 923, 944 (9th Cir. 1998) (citing *Zant v. Stephens*, 462 U.S. 862, 880 (1983) for the proposition that the United States Constitution requires only that a state provide procedures to guide the sentencer's discretion generally). In addition, the district court noted that we rejected this very argument in *Smith v. Stewart*, 140 F.3d 1263, 1272 (9th Cir. 1998).

Claim 45 - *Ineffective Assistance of Counsel - (sleeping through significant portions of the trial)*

The district court determined, in light of the evidence presented in the state court proceedings, that the state court did not rely on an unreasonable determination of facts in rejecting Roger's allegation that his counsel slept throughout a significant portion of the trial and thus was constitutionally ineffective. Only Roger testified that he actually observed his lawyer sleeping, and multiple other witnesses testified that they did not see the lawyer asleep and that he was active and zealously involved in Roger's defense. Additionally, the district court noted testimony from Roger's lawyer and from co-counsel that Roger did not complain about his lawyer falling asleep in court.

The district court also rejected Roger's argument that he did not receive a fair hearing because the trial court judge was a key witness and also the presiding judge for the PCR

proceedings. The district court relied on *Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997), where we held that a trial court judge may also preside over post-conviction proceedings. The district court denied this claim.

　　Claim 48 - *Ineffective Assistance of Counsel - (failure to present exculpatory witness)*

　　The PCR court concluded that Robert's counsel was not ineffective when attempting to locate the alleged exculpatory witness. The district court determined that even if Roger's counsel was ineffective in failing to present that same witness, the outcome of the trial would have been the same. The proposed exculpatory testimony that the victim was seen with three other men on the night of the murder would not have overcome the insurmountable inculpatory evidence. Because Roger could not establish prejudice in any event, the state court's determination was not contrary to clearly established federal law, *see Strickland v. Washington*, 466 U.S. 668, 687–88 (1984).

　　The district court declined to issue a Certificate of Appealability (COA) after denying Roger's petition. Roger subsequently filed a timely appeal, and we issued a COA for the following claims:

- Claim 1 - denial of requested change of venue;

- Claim 5 - denial of fair cross-section in the jury venire;

- Claim 6 - *Batson* violation;

- Claim 7 - denial of request to inspect the crime scene;

- Claim 16 - omission of voluntary intoxication instruction;

- Claim 17 - denial of a lesser included offense instruction;

- Claim 26 - failure to consider mitigating evidence;

- Claim 44 - denial of request to replace counsel due to irreconcilable conflict;

- Claim 45 - ineffective assistance of counsel (IAC) due to counsel's inattentiveness; and

- Claim 48 - IAC due to counsel's failure to present exculpatory witness.

## II.  STANDARDS OF REVIEW

We review *de novo* a district court's denial of a habeas petition. *See Fairbank v. Ayers*, 650 F.3d 1243, 1250 (9th Cir. 2011), *as amended*.

Because Roger filed his petition for a writ of habeas corpus after April 24, 1996, the Antiterrorism and Effective Death Penalty Act (AEDPA) applies. *See Valerio v. Crawford*, 306 F.3d 742, 763 (9th Cir. 2002) (en banc). Under AEPDA, we are barred from granting relief unless the state court decision: "(1) was contrary to clearly established federal law as determined by the Supreme Court, (2) involved an unreasonable application of such law, or (3) . . . was based

on an unreasonable determination of the facts in light of the record before the state court." *Fairbank*, 650 F.3d at 1251 (citation and internal quotation marks omitted).

A state court's decision is contrary to clearly established federal law if its decision contradicts the governing law articulated by the Supreme Court or reaches a result different than that reached by the Supreme Court on materially indistinguishable facts. *See Terry Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court's decision is an unreasonable application of clearly established federal law when the state court identifies the correct legal rule, but applies it to a new set of facts in a way that is objectively unreasonable. *See id*. at 407.

"Clearly established federal law means the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Xiong v. Felker*, 681 F.3d 1067, 1073 (9th Cir. 2012) (citation omitted). Although "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably[,]" *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citation omitted), our determination of clearly-established law under AEDPA must ultimately rest on a Supreme Court holding, not on dicta that we have interpreted in circuit decisions. *See Carey v. Musladin*, 549 U.S. 70, 74, 77 (2006); *see also Wright v. Van Patten*, 552 U.S. 120, 125–26 (2008) (reiterating that a Supreme Court case must have "squarely address[ed]" a certain issue and given a "clear answer" regarding the applicable legal rule to create "clearly established federal law for AEDPA purposes").

Under AEDPA, we review the "last reasoned decision" from the state court, which means that when the final state court decision contains no reasoning, we may look to the last decision from the state court that provides a reasoned explanation of the issue. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In circumstances where no decision from the state court articulates its underlying reasoning, "the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. . . ." *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). In determining whether a petition has met this burden, we "must determine what arguments or theories supported or . . . could have supported [ ] the state court's decision;" and then assess "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]. . . ." *Richter*, 131 S. Ct. at 786 (citation omitted). Accordingly, "when the state court does not supply reasoning for its decision, we are instructed to engage in an independent review of the record and ascertain whether the state court's decision was objectively unreasonable." *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (citation and internal quotation marks omitted)." "Crucially, this is not a *de novo* review of the constitutional question. Rather, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citations and internal quotation marks omitted).

Finally, so long as we are reviewing a petitioner's claim under AEDPA, our review is limited to the facts before the state court and the petitioner is not entitled to an evidentiary hearing in federal court. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011).

## III.    DISCUSSION—Issues Raised in Federal Appeal

### A.  Claim One - Denial of Requested Change of Venue

Roger argues that the denial of his change of venue motion violated his due process right to a fair trial.  He contends that there was a barrage of pretrial publicity that was false and prejudicial.  He also asserts that there is a heightened obligation to change venue in capital cases.

The Sixth Amendment guarantees a defendant's right to trial before an impartial jury.  *See Skilling v. United States*, 130 S. Ct. 2896, 2912–13 (2010).  When an impartial jury cannot be empaneled due to pretrial publicity, a change of venue at the request of the defendant is appropriate to prevent violation of the defendant's due process right to a fair trial. *See id*. at 2913.

To support a change of venue request, the defendant must establish either presumed or actual prejudice.  *See id*. at 2907. The Supreme Court has explained that a court may presume prejudice only when the "trial atmosphere [is] utterly corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (citing *Murphy v. Florida*, 421 U.S. 794, 798 (1975)), or when "a wave of public passion . . . ma[kes] a fair trial unlikely by the jury . . ." *Patton v. Yount*, 467 U.S. 1025, 1040 (1984) (internal quotation marks omitted).   Juror exposure to news reports of a crime–even "pervasive, adverse publicity"–is not enough alone to trigger a presumption of prejudice to the defendant's due process rights.  *Skilling*, 130 S. Ct. at 2916 (describing the "vivid, unforgettable" and "blatantly prejudicial" information at issue in the handful of cases in which the Supreme Court has presumed prejudice as a result of pretrial publicity) (citing *Rideau v. Louisiana*,

323 U.S. 723 (1963); *Estes v. Texas*, 381 U.S. 532 (1965); *Sheppard v. Maxwell*, 384 U.S. 333 (1966)). Rather, a presumption of prejudice "attends only the extreme case." *Id.* at 2915.

In the alternative, a defendant may establish the existence of actual prejudice if, during voir dire, potential jurors who have been exposed to pretrial publicity express bias or hostility toward the defendant that cannot be cast aside. *Id*. at 2918 & n.20 (citing *Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991)). The reviewing court must give deference to the trial court's assessment of the impartiality of potential jurors, since that assessment "is ordinarily influenced by a host of facts impossible to fully capture in the record . . ." *Skilling*, 130 S. Ct. at 2918; *see also Mu'Min*, 500 U.S. at 427. ("The judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror. . . .").

The last reasoned state court decision addressing the pretrial publicity issue was the Supreme Court of Arizona opinion. *See Murray*, 906 P.2d at 559. The state supreme court held that Roger failed to demonstrate media attention so extreme that prejudice could be presumed. *See id.* Roger introduced several newspaper articles and presented two witnesses, a news director and the defense investigator, to establish presumed prejudice. The newspaper articles were primarily factual descriptions of the crime and the court proceedings. Roger highlights two newspaper articles and a photograph to support his argument. The articles' captions were "Two Alabama Brothers Are Arraigned for Brutal Slayings" and "Murray Brothers Are Suspects in Crime Spree." The referenced photograph depicted Robert and

Roger standing near a transport van. The text below the photograph stated that at least eight law enforcement officers escorted the brothers, and that two armed officers were stationed on nearby rooftops.

The witnesses testified that people in the area were aware through news reports of the brothers and of the crimes committed, and that some members of the community had expressed the view that the brothers were guilty. After considering the evidence presented, the state court concluded that Roger failed to specify "*what* pretrial publicity was so outrageous," as to create an atmosphere that was "utterly corrupted." *Murray*, 906 P.2d at 559 (citation omitted) (emphasis in the original). Nor was the court convinced that the security measures implemented for trial "creat[ed] a contaminated atmosphere," warranting a presumption of prejudice. *Id.* Finally, the court found that no actual prejudice was shown. Although some of the prospective jurors were aware of the crime generally, potential juror bias was probed extensively in the jury questionnaire and during voir dire. *See id.* Any prospective juror who failed to convince the court that he could be objective despite the pretrial publicity was not allowed to remain on the jury panel. *See id.* Once seated, jurors were repeatedly admonished to avoid media coverage of the trial proceedings. *See id.* After reviewing this record, the Arizona Supreme Court affirmed the trial court's denial of the requested venue change. *See id.*

Roger relies on *Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) and *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005) to support his argument that the state court's decision was unreasonable. As the Supreme Court has made clear, however, simply because a state court decision is inconsistent with circuit precedent does not mean that it is an

unreasonable application of clearly established federal law "as determined by the Supreme Court." *Richter*, 131 S. Ct. at 784 (quoting 28 U.S.C. § 2254); *see also Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013). Thus, our circuit precedent is only relevant to the extent that, "in accordance with [our] usual law-of-the circuit procedures, . . . [we] ha[ve] already held that the particular point in issue is clearly established by Supreme Court precedent . . ." *Marshall*, 133 S. Ct. at 1450 (citations omitted). "[We] may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court be accepted as correct. . . ." *Id*. at 1451 (citations omitted). Therefore, Roger's argument that his case is similar to the presumed prejudice determinations in *Coleman* and *Daniels*, *see Coleman*, 778 F.2d at 1537–38, *Daniels*, 428 F.3d at 1211, is inapposite to our analysis on habeas review.

Our precedent does, however, require that we "conduct an independent review of news reports about the case." *Daniels*, 428 F.3d at 1210 (citation omitted). An independent review of the record reveals that Roger presented a number of newspaper articles to the state court. The bulk of the pretrial articles were published months prior to trial. And it is important to note that not all of these articles are from Mohave County, or are even about Roger. Some of the articles, particularly the editorials, were about the death penalty in general. It appears that this is because, around the time of Roger's trial, Arizona was preparing to execute a man for the first time since 1963. This situation created interest, leading people to question whether the death penalty should be supported by society in general. In fact, some of the editorials actually questioned whether the death penalty is appropriate. One editorial stated that killers should be put six

feet under, but the statement was a general one, not directed toward Roger, neither assuming his guilt, nor calling for his punishment. Only two editorials actually referenced Roger. One referred to "the Murray brothers" being represented by Frank Dickey. The editorial continued by criticizing Mr. Dickey's personal views concerning the death penalty. The other was a letter to the editor praising the judicial system for denying the defense motion to suppress evidence obtained after a license plate check by an Arizona DPS officer resulted in the Murrays' apprehension. The letter was anything but inflammatory toward Roger, again not even referring to him by name, but as one of the Murray brothers.

The vast majority of the articles submitted by Roger reported only facts, relaying information regarding what happened at trial on particular days. One article, that ran long before trial, mentioned that the victims were shot "execution style" and that an elderly woman had also been attacked by the brothers in Alabama. The problem with relying on this article is that it ran in an Alabama newspaper, thousands of miles from the trial venue. An article describing the brothers as suspects in a crime spree did run in the Kingman, Arizona, newspaper over a year before the trial. The article detailed allegations of a robbery and assault against an elderly woman in Alabama. Finally, as mentioned by Roger, a newspaper ran an article about the venue hearing, including a picture of the brothers being escorted to the jail and a description of armed officers "perched on rooftops" overlooking them.

Roger also proffered evidence of radio publicity. David Hawkins, the news and sports director for various local radio stations, testified that the radio stations' transmission areas covered the bulk of the residents in Mohave County. Mr. Hawkins brought to court copies of the vast majority of

the stories that had been broadcast on the radio. He testified that the community was "upset with what happened to the victims in this case, and they are curious about the outcome of this particular–not this particular proceeding, but the whole of this case." Mr. Hawkins further testified that he had heard some expressed opinions that the defendants were guilty, although he had only spoken to a "couple dozen" members of the community–mostly people in legal circles, reporters and social acquaintances.

Of the fifty-seven stories Mr. Hawkins brought to court, some mentioned that the brothers were connected to a robbery/assault in Alabama, that they might be linked to murders in California and New Mexico, and that the murders were committed "execution style." Overall, however, the radio news reports were brief and factual in nature.

Finally, John Freeman, a defense investigator, testified that he had spoken to a number of people about the case who thought the brothers were guilty and should "get a quick trial."

We conclude that the Arizona Supreme Court's determination that prejudice could not be presumed was not contrary to or an unreasonable application of Supreme Court precedent, and while it does not impact our AEDPA inquiry, we note that the ruling was consistent with *Coleman* and *Daniels* as well.

The publicity surrounding Roger's trial fell far short of the "utterly corrupted" trial environment that existed in *Rideau*, *Estes*, and *Sheppard*, the three cases the Supreme Court described in *Skilling* as establishing the threshold for presumed prejudice due to pretrial publicity. *Skilling*, 130 S.

Ct. at 2913–14. In *Rideau*, the defendant's confession was broadcast on television three times, and two-thirds of the local community saw or heard the broadcast. *See* 373 U.S. at 724–26. In *Estes*, there was extensive media presence *in* the courtroom, including microphones, television cameras, and photographers; these facts combined with the live telecast and rebroadcast of a pre-trial hearing, led the Court to conclude that such intrusion was inherently prejudicial. *See* 381 U.S. at 550–51. Finally, in *Sheppard*, news articles emphasized that the defendant's extramarital affairs were a motive for the crime, characterized the defendant as a liar, and described incriminating evidence and discrepancies in defendant's statements. *See* 384 U.S. at 340–41. Likewise, in both *Coleman* and *Daniels*, an onslaught of inflammatory publicity resulted in a denial of due process. *See Coleman*, 778 F.2d at 1538–39; *see also Daniels*, 428 F.3d at 1212. For example, in *Coleman*, we emphasized comments on the evidence from law enforcement officials, derogatory descriptions of the defendants, remarks from potential defense attorneys seeking to avoid appointment, and editorials expressing the appropriateness of the death penalty. *See Coleman*, 778 F.2d at 1539–40.

By contrast, news coverage of the crimes committed by the Murray brothers was almost invariably fact–based. There was no inflammatory barrage of information that would be inadmissible at trial. Rather, the news reports focused on relaying mainly evidence presented at trial. These news reports do not come anywhere close to the kind of "vivid, unforgettable" and "blatantly prejudicial" atmosphere that occurred in *Rideau*, *Estes*, and *Sheppard*. *Skilling*, 130 S. Ct. at 2916–17.

Roger seeks to avoid this conclusion by arguing that the legal standard for prejudice is somehow lower in capital cases, contending that there is a "heightened obligation to be particularly serious to the need for change of venue for capital cases." But Supreme Court precedent provides no support for this proposition. In *Dobbert*, to illustrate, the Court expressly applied *Murphy* in upholding the petitioner's death sentence. *See Dobbert*, 432 U.S. at 302. The Court has not since departed from that standard.

Roger also notes that *Murphy* sets forth a "totality of the circumstances" test for whether media coverage has "utterly corrupted" the trial, and that the Arizona Supreme Court therefore erred in holding that Roger fell short of the standard because he "failed to show *what* pretrial publicity was so outrageous." That is, Roger believes that he was subjected to too high a bar, in that he should not have been required to cite specific instances of outrageous publicity. But the Arizona Supreme Court cited and considered the evidence that Roger advanced, and simply found that because none of the evidence was individually problematic, it would be impossible to conclude that the totality of circumstances had "utterly corrupted" the trial as described in *Murphy. Murray*, 906 P.2d at 559. This conclusion was not contrary to or an unreasonable application of clearly established federal law, as summarized most recently in *Skilling*.

In addition, we conclude that the Arizona Supreme Court's determination that no actual prejudice was shown was not contrary to or an unreasonable application of Supreme Court precedent. *See Mu' Min*, 500 U.S. at 429–30. Although some of the prospective jurors were aware of the crime generally, potential juror bias was probed extensively in the jury questionnaire and during *voir dire*. *See Murray*,

906 P.2d at 559. Any prospective juror who failed to convince the court that he could be objective despite the pretrial publicity was not allowed to remain on the jury panel. *See id*. Once seated, jurors were repeatedly admonished to avoid media coverage of the trial proceedings. *See id*. After reviewing this record, the Arizona Supreme Court affirmed the trial court's denial of the requested venue change. *See id*.

Our independent review of the *voir dire* record reveals that of the seventy-seven potential jurors, only one indicated that she had previously formed an opinion regarding the case. That potential juror stated: "Being people were arrested, I automatically thought guilty." That same juror indicated that it would be difficult for her to overcome her opinion of guilt based upon the arrest of an individual. That juror was excused by the trial judge, and only two other potential jurors mentioned that they had opinions about the circumstances of the crime. The one potential juror's opinion concerned the horrible nature of the crime, not the guilt or innocence of Roger, while the other potential juror's opinion was regarding how a crime like this could happen, not the guilt or innocence of Roger. Both indicated that they could set aside their opinions and be fair and impartial. The record indicates that no other potential juror had extensive knowledge of the case; indeed, some even stated that they had never heard of the case. We therefore conclude that the Arizona Supreme Court's determination that Roger did not establish either presumed or actual prejudice was neither contrary to nor an unreasonable application of Supreme Court precedent.

### B. Claim Five - Denial of Fair Cross-Section of the Community in the Jury Venire.

Roger contends that the jury commissioner purposely excluded jurors who stated that it was contrary to their Christian beliefs to sit in judgment of others. According to Roger, this purposeful exclusion violated his rights under the Sixth Amendment (the Fair Cross-Section Doctrine) and the Equal Protection Clause of the Fourteenth Amendment.[10]

On direct appeal, Roger argued that the Sixth and Fourteenth Amendments had been violated because the jury list was composed of an out-of-date driver's license list and did not include voter registration lists. Moreover, Roger asserted that even after the jury list was corrected, because the deadline for returning jury questionnaires was after the date the jury would be picked, potential jurors from rural areas were likely to be underrepresented. Finally, Roger argued that because the state notified jurors to present themselves for service by telephone, its procedures systematically excluded individuals who could not afford telephones. Roger contended that these failures resulted in the exclusion of young people, poor people, and those hailing from rural areas, thereby depriving the brothers of a jury of their peers who were most likely to "understand" them, since the brothers were young, poor, and from rural Alabama.

The Arizona Supreme Court thoroughly dealt with the issues raised by Roger on direct appeal, holding that under *Duren* and relevant precedent of its own, Roger failed to

---

[10] The district court found that Roger did not raise the Fifth and Eighth Amendment aspects of this claim in state court, rendering those aspects of the claim procedurally barred. We agree.

show that young, poor, or rural people were a "distinctive" group for fair cross-section purposes. *Murray*, 906 P.2d at 556–57. Roger has again raised a fair cross-section claim before us, but for good reason, makes no argument challenging the decision actually rendered by the Arizona Supreme Court. On federal habeas review, Roger now raises only the exclusion of Christians as the basis for his Sixth Amendment fair cross-section argument and Fourteenth Amendment equal protection argument. Although Roger made fair cross-section and equal protection arguments before the Arizona Supreme Court, he did not mention the exclusion of Christians as a basis for these claims. Before us, the claim asserting exclusion of Christians is brand new.

We are unable to grant federal habeas relief when a petitioner has failed to exhaust his claim in state court. *See* 28 U.S.C. § 2254(b)(1)(A). The exhaustion requirement affords state courts the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights. . . ." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation and internal quotation marks omitted); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004). To satisfy the exhaustion requirement, a petitioner "must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review . . .")," *Baldwin*, 541 U.S. at 29 (citations omitted). The purpose of the fair presentation doctrine "is to prevent unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution." *Picard*, 404 U.S. at 275 (citation and internal quotation marks omitted). However, "[t]he rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts." *Id*. at 276. "Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas

proceeding does it make sense to speak of the exhaustion of state remedies. Accordingly, [the Supreme Court] ha[s] required a state prisoner to present the state courts with the *same* claim he urges upon the federal courts." *Id*. (citations omitted) (emphasis added).

Here, Roger never provided the Arizona Supreme Court with the opportunity to determine whether the exclusion of Christians violated his Sixth or Fourteenth Amendment rights. Like the state court in *Picard*, the Arizona Supreme Court had no "opportunity to apply controlling legal principles to the facts bearing upon (his) constitutional claim." *Id*. at 277 (citation omitted). As in *Picard*, we cannot fault the Arizona Supreme Court for "failing also to consider sua sponte" whether the exclusion of Christians might have violated Roger's constitutional rights. *Id*. Roger's argument before the Arizona Supreme Court contained no mention of Christians being excluded from the jury pool. Thus, we cannot say that Roger's current fair cross-section/equal protection claim predicated on the exclusion of Christians is the "substantial equivalent" of his claim before the state court targeting the exclusion of young people, poor people, and those from rural areas. *Id*. at 278. This claim, then, is unexhausted and procedurally defaulted. *See* Ariz. R. Crim. P. 32.2(a); *see also Poland v. Stewart*, 169 F.3d 573, 578 (9th Cir. 1999).

Even if this claim were not unexhausted and procedurally defaulted, it is without merit. *See* 28 U.S.C. § 2254(b)(2) (providing that "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); *see also Bell v. Cone*, 543 U.S. 447, 451 & n.3 (2005) (applying § 2254(b)(2) to reach on the merits a

petitioner's unexhausted but meritless claim). The only evidence in the record regarding the exclusion of Christians is the following colloquy:

> [Prosecutor]: And do you [jury commissioner] excuse anybody because they state any particular religious denomination?
>
> [Jury Commissioner]: Only one group, and I wish–I don't remember. Seventh Day Adventists or Jehova's [sic] Witnesses have stated on their questionnaire and sent copies, I mean a page out of their Bible that it is against their religious beliefs to sit in judgment of anyone. And only if they request it.

To establish the lack of a fair cross-section of the community, a defendant must demonstrate that: (1) the group alleged to be excluded is a distinctive one in the community; (2) representation of this group in the jury venires is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *See Berghuis v. Smith*, 130 S. Ct. 1382, 1392 (2010) (citing *Duren*, 439 U.S. at 364).

An equal protection violation arises if a jury selection process resulted in a substantial underrepresentation of an identifiable group. *See Castaneda v. Partida*, 430 U.S. 482, 494 (1977). First, there must be identification of a group that is recognizable, distinctive, and singled out for different treatment under the laws as written or applied. *See id.* Second, there must be a showing that the distinctive class was

proportionately underrepresented over a significant period of time. *See id.* Finally, there must be evidence that the juror selection process was susceptible to abuse or was not neutral. *See id.* Only after this *prima facie* showing is made must the state defend its jury selection process. *See id.*

Roger does not identify any Supreme Court precedent that would require the state to interrogate the individuals who revealed that it was against their religious beliefs to serve on a jury, and would require the jurors to re-confirm their ability to set aside their beliefs and apply the governing law. To the extent Roger advances a claim of error in rejecting this argument, the claim is meritless.

As for the Sixth Amendment claim, Roger has failed to show any systematic exclusion of a distinct group. In fact, Roger has not shown that *any* Christians were excluded. Moreover, the jury commissioner testified that members of specific religious denominations are excluded *only* if they request exclusion based on their particular religious beliefs. This practice does not constitute systematic exclusion. Likewise, Roger's equal protection claim fails because the jury commissioner did not disclose that any specific religious denomination, or Christians, are singled out for disparate treatment. The evidence only supports the conclusion that individuals are excluded if exclusion is specifically requested due to religious beliefs. By no stretch of the imagination does this meager evidence satisfy the required showings of systematic exclusion and disparate treatment. Thus, even if Roger's claim were not procedurally defaulted, we would conclude that the Arizona Supreme Court's decision denying Roger's fair cross-section/equal protection claim was not contrary to or an unreasonable application of Supreme Court precedent.

### C.  Claim Six -  *Batson* **Violation**

Roger contends that the state violated *Batson* when it dismissed the only two Hispanic potential jurors from the jury venire.

For the reasons set forth in *Robert Murray v. Schriro*, No. 08-99008, Slip. Op. pp. 27–42 (9th Cir. March 17, 2014), we affirm the district court's denial of Roger's *Batson* claim.

### D.  Claim Seven - Denial of Request to Inspect the Crime Scene

Citing *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), Roger argues that the trial court denied him due process by denying his new investigator access to the crime scene for inspection.  Additionally, Roger asserts that the Supreme Court of Arizona's ruling "is not entitled to any deference," because it did not address his federal constitutional claims and relied only on state law.  Roger's arguments are unpersuasive.

The last reasoned decision addressing the inspection due process claim is the decision of the Supreme Court of Arizona denying relief.  The state court found that Roger failed to support the purported necessity of viewing the crime scene for a second time.  *See Murray*, 906 P.2d at 569.

The United States Supreme Court has instructed that evidence sought by a defendant must be material.  *See United States v. Bagley*, 473 U.S. 667, 682 (1985).  Merely showing that access to evidence was denied does not establish a constitutional violation.  *See Valenzuela-Bernal*, 458 U.S. at 867.  The defendant must make a plausible argument that the

evidence sought is "both material and favorable to his defense," *id*., and not "merely cumulative" to other evidence. *Id*. at 873 (footnote reference omitted). Evidence is material in the constitutional sense if there is a "reasonable likelihood" that it "could have affected the judgment of the trier of fact" if it had been made available to the defense. *Id*. at 874.

Roger's lead counsel and his investigator inspected the crime scene shortly after the crime was committed and approximately a year prior to his trial. *See Murray*, 906 P.2d at 569. Co-counsel from the same public defender's office and an additional investigator were subsequently assigned to Roger's defense team. *See id.* However, neither the new attorney nor the new investigator visited the crime scene prior to trial. *See id.* During trial, defense counsel requested an opportunity to revisit the crime scene. *See id.* The trial court denied the request. *See id.* The Arizona Supreme Court affirmed the trial court's finding that Roger failed to establish the need for a second inspection. *See id.*

The state court decision was not contrary to *Valenzuela-Bernal*. In *Valenzuela-Bernal* the Court explained that a defendant only has a right to evidence that is "relevant and material" to his defense. *Valenzuela-Bernal*, 458 U.S. at 867. Roger failed to show how inspection of the crime scene a year later, and after the scene had been cleaned, *see Murray*, 906 P.2d at 569, would uncover evidence that was "relevant and material" to his defense. *Valenzuela-Bernal*, 458 U.S. at 867. The Arizona Supreme Court's decision was not contrary to or an unreasonable application of Supreme Court precedent. *See id.* at 874 (holding that there was no constitutional violation in similar circumstances).

Roger also contends that because the Arizona Supreme Court did not address his federal due process claim, no AEDPA deference is warranted on this issue. However, as stated, even if the state court does not analyze a claim, we nevertheless review the state court decision with deference to the state court's denial of relief. *See Johnson*, 133 S. Ct. at 1094; *see also Cunningham v. Wong*, 704 F.3d 1143, 1153 (9th Cir. 2013). In the same vein, if a state court does not explicitly state the reason for denying a claim, we presume that the state court adjudicated the claim on its merits. *See Richter*, 131 S. Ct. at 784–85. Although this presumption "may be overcome when there is reason to think some other explanation for the state court's decision is more likely," *id*. at 785, Roger does not suggest any such reason. When a state court determines a federal claim without discussing federal precedent, AEPDA deference to the state court's decision remains, and it is still "the habeas petitioner's burden" to show "there was no reasonable basis for the state court to deny relief. . . ." *Id*. at 784.

Although the Arizona Supreme Court did not explicitly address Roger's federal constitutional claim, it provided adequate reasoning based on state law to affirm the trial court's ruling denying Roger's motion to revisit the crime scene. *See Murray*, 906 P.2d at 569. Notably, in his brief to the Arizona Supreme Court, Roger cited *Valenzuela-Bernal*, a case he characterized as incorporating "constitutionally guaranteed access to evidence." *See Johnson*, 133 S. Ct. at 1099 (referring to the defendant's brief to determine that the federal claim was addressed). Moreover, in denying Roger's claim, the Arizona Supreme Court cited Arizona Rule of Criminal Procedure 15.1(e), which governs the circumstances under which a trial court may grant additional disclosure requests by the defendant. *See Murray*, 906 P.2d at 569. As

in *Johnson*, it is "difficult to imagine" the Arizona Supreme Court "announcing an interpretation of" Rule 15.1(e) "that it believed to be less protective than" the Fourteenth Amendment, "as any such interpretation would provide no guidance to state trial judges bound to follow both state and federal law." *Johnson*, 133 S. Ct. at 1098. And, as we have already explained, it is apparent that "neither the reasoning nor the result of the state-court decision contradicts" the Supreme Court's rule in *Valenzuela-Bernal*. *Early v. Packer*, 537 U.S. 3, 8 (2002). Thus, the Arizona Supreme Court addressed Roger's Sixth Amendment claim when it denied relief on Roger's challenge to the denial of the requested inspection, and its determination was not contrary to or an unreasonable application of clearly established federal law. *See Johnson*, 133 S. Ct. at 1099.

### E. Claim Sixteen - Omission of Voluntary Intoxication Instruction

Citing *Dunckhurst v. Deeds*, 859 F.2d 110 (9th Cir. 1988), Roger contends that failure of the trial court to give a voluntary intoxication instruction, violated his due process right to a fair trial. Both defendants requested an intoxication instruction, which the trial court denied, reasoning that the defendants "ha[d not] made out any credible evidence on intoxication."

Roger's reliance on *Dunckhurst* is misplaced. *Dunckhurst* is a pre-AEDPA case relying on our precedent developed during direct appeal of criminal convictions. *See* 859 F.2d at 114 (citing *United States v. Lesina*, 833 F.2d 156 (9th Cir. 1987)). Once again, our circuit precedent is only relevant to the extent that "in accordance with [our] usual law-of-the-circuit procedures, . . . [we] ha[ve] already held that the

particular point in issue is clearly established by Supreme Court precedent . . ." *Marshall*, 133 S. Ct. at 1450 (citations omitted). *Dunckhurst* does not purport to determine that a particular rule is clearly established federal law under Supreme Court precedent. Consequently, *Dunckhurst* is inapposite to our analysis on federal habeas review.

The Arizona Supreme Court provided the last reasoned decision for this claim, affirming the trial court's conclusion that Roger had failed to establish that the alcohol he allegedly consumed affected his "ability to think, function, or form intent." *Murray*, 906 P.2d at 566. The Arizona Supreme Court explained, that under A.R.S. § 13-503[11] (1992), a voluntary intoxication instruction "should be given only when the record supports such an instruction . . . ." *Id.* at 566–67 (citation omitted). A mere showing of alcohol consumption alone is inadequate to require giving an intoxication instruction. *See id*. at 567. The defendant must also establish that the effect of the alcohol negated an element of the crime. *See id*. The court determined that Roger had failed to meet this burden. *See id*.

---

[11] A.R.S. § 13-503 (1992) provided:

> No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

Due process does not require the jury to be instructed regarding the defendant's intoxication at the time of the crime. *See Montana v. Egelhoff*, 518 U.S. 37, 51, 56 (1996). But, where a state has decided that a party is entitled to an intoxication instruction, a failure to so instruct the jury is reviewed to determine if the error has "so infected the entire trial that the resulting conviction violates due process. . . ." *Estelle*, 502 U.S. at 72 (citations omitted). As the Arizona Supreme Court noted in its decision on direct appeal, "[a] party is entitled to an instruction on any theory reasonably supported by evidence. An intoxication instruction should be given only when the record supports such an instruction." *State v. LaGrand*, 733 P.2d 1066, 1070 (Ariz. 1987) (citations omitted); *see also Murray*, 906 P.2d at 566–67. Roger faces a particularly heavy burden in seeking to establish a due process violation because a jury instruction was omitted rather than erroneously given. "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law. . . ." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

As the Arizona Supreme Court noted, Roger did present evidence that he had been drinking on the night of the crime. *See* 906 P.2d at 566. Roger's counsel stated that "[t]he jury, from the evidence before it, could perhaps determine that the defendants over the period of time they had been drinking, did become intoxicated. . . ." The prosecutor responded that "the State doesn't believe there's any evidence of intoxication. The only direct testimony on that was a person at the bar . . . that said they did not appear to be intoxicated or under the influence. . . ." Based on this evidence, the trial court–and the Arizona Supreme Court–found that:

[Murray had not] made out any credible evidence on intoxication. The fact that the defendants were drinking isn't–there's no testimony as to what effect that had on their ability to think or their abilities to function or to form the intent involved, and I will not give an instruction on intoxication.

Roger has only argued that the trial court did not consider certain facts in making its determination that he had failed to show that he was intoxicated. Raw speculation aside, Roger presents no evidence that tends to call into question the trial court's factual determination that Roger had not proven that his drinking on the night of the crime–the only evidence that could be established–had a substantial effect on him such that he lacked the requisite intent. Based on our review of the record, we agree that the evidence did not support Roger's voluntary intoxication defense. Therefore, the Arizona Supreme Court's denial of Roger's claim that the trial court's omission of the intoxication instruction constituted a due process violation was not contrary to or an unreasonable application of federal law as established by the Supreme Court. *See Estelle*, 502 U.S. at 72; *see also Mathews v. United States*, 485 U.S. 58, 63 (1988) (explaining that a defendant is only entitled to an instruction on a defense theory supported by the evidence).

### F.  Claim Seventeen - Denial of a Lesser Included Offense Instruction

Roger argues that the trial court denied him due process when it denied the defendants' request to instruct the jury on second degree murder as a lesser included offense. Relatedly, Roger also asserts that the trial court's decision contravened

*Enmund v. Florida*, 458 U.S. 782 (1982) and *Tison v. Arizona*, 481 U.S. 137 (1987), by imposing the death penalty when Roger did not intend to take a life or intend that lethal force be used.

The last reasoned decision addressing this issue is the Arizona Supreme Court's denial of relief, explaining that a lesser included offense instruction is warranted only if supported by the evidence. *See Murray*, 906 P.2d at 567. The court reasoned that an instruction on second degree murder would only apply to premeditated murder, but not to felony murder, which was the crime of conviction. *See id.* In addition, the crime of second degree murder is characterized by evidence of lack of premeditation and deliberation. *See id.* The Arizona Supreme Court adopted the trial court's determination—considering that the victims were forced to lie on the carpet and were shot in the back of the head with different weapons, the only rational inference was that the murders were deliberate and premeditated, thereby precluding a verdict of second degree murder.[12] *See id.*

---

[12] A.R.S. § 1104 (1992) provided in pertinent part:

A. A person commits second degree murder if without premeditation:

1. Such person intentionally causes the death of another person; or

2. Knowing that his conduct will cause death or serious physical injury, such person causes the death of another person; or

3. Under circumstances manifesting extreme indifference to human life, such person recklessly engages in conduct which creates a grave risk of death

"[D]ue process requires that a lesser included offense instruction be given only when the evidence warrants such an instruction. . . ." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (citing *Beck v. Alabama*, 447 U.S. 625 (1980)).

> The element the Court in *Beck* found essential to a fair trial was not simply a lesser included offense instruction in the abstract, but the enhanced rationality and reliability the existence of the instruction introduced into the jury's deliberations. Where no lesser included offense exists, a lesser included offense instruction detracts from, rather than enhances, the rationality of the process. *Beck* does not require that result. *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).

In Arizona, "[t]o determine whether there is sufficient evidence to require the giving of a lesser included offense instruction, the test is whether the jury could rationally fail to find the distinguished element of the greater offense. . . ." *State v. Krone*, 897 P.2d 621, 625 (Ariz. 1995) (in banc) (quoting *State v. Detrick*, 873 P.2d 1302, 1305 (Ariz. 1994) (internal quotation marks omitted)). The Arizona rule comports with the federal rule and therefore does not offend constitutional standards. *See Hopper*, 456 U.S. at 612 ("The federal rule is that a lesser included offense instruction should be given if the evidence would permit a jury rationally to find a defendant guilty of the lesser offense and acquit him of the greater.") (citation, alteration, and internal quotation marks omitted). Thus, the Arizona Supreme Court's reliance on this

---

and thereby causes the death of another person.

rule was not contrary to or an unreasonable application of clearly established federal law.[13]

Moreover, at trial, the judge directly asked what evidence supported an instruction that the offense could have been something other than first-degree murder. Roger's counsel could not point to any actual evidence suggesting anything other than premeditation. Rather, counsel responded that "we cannot look into the jury's mind and determine whether or not they are going to find premeditation or not. . . ." In turn, the prosecutor stated:

> Here what we have are repeated gunshots on a helpless couple laying on the floor. Somebody is guilty of premeditated murder. The defendants can argue it's not them certainly, but the way the victims died can only be premeditated. There's no way that you can look at that set of facts and say that is not premeditated, looking at the analysis under *Lamb*.

Based on the record, the trial court ruled:

> Well, if based on the physical evidence, I don't see how it can be anything other than first degree murder. It may not be the

---

[13] Roger also argues that "[i]f the jury had been given the intoxication instruction and they had found [his] intoxication negated the specific intent necessary for a conviction of first degree premeditated murder, then the jury could have found [him] guilty of second degree murder. . . ." As we stated above, the record did not support an intoxication instruction, so this argument is unavailing; the evidence also did not warrant a second-degree murder instruction based on intoxication.

> defendants, that's for the jury to decide. The
> whole defense is based on other things other
> than the actual death of the victims. It's either
> first degree murder or it's nothing. And in
> essence, I agree with the State. So, I will not
> give second degree murder as a lesser.

The Arizona Supreme Court agreed: "Defendants had the victims lie on the carpet of their living room and proceeded to shoot each of them with different weapons in the back of the head. The only inference that a jury rationally could have drawn was that defendants premeditated." *Murray*, 906 P.2d at 567 (citation omitted).

Roger argues that the Arizona Supreme Court's decision is contrary to *Enmund* and *Tison*. In *Enmund*, the defendant participated in a robbery that ultimately resulted in murder, although the defendant did not murder anyone or intend for anyone to be killed. *See* 458 U.S. at 798. The United States Supreme Court noted that "the Florida Supreme Court held that the record supported no more than the inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape. . . ." *Id*. at 788. There was no evidence *in Enmund* that the defendant actively participated in the murders or was present when the victims were murdered. *See id.* Based solely on those facts, the Supreme Court held that the imposition of a death sentence upon a defendant who did not kill or intend to kill the victims violated the Eighth Amendment. *See id.* at 801. But on the other hand, as the Supreme Court clarified several years later, "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement" for when the death penalty may be

imposed. *Tison*, 481 U.S. at 151–52, 158 (so holding where two brothers brought "an arsenal of lethal weapons" into an Arizona prison with the intent to arm convicted murderers and help them escape, "participated fully in the kidnapping and robbery and watched the killing").

Unlike the facts in *Enmund*, and similar to those in *Tison*, the Arizona Supreme Court found that the physical evidence substantiated Roger's involvement as an active participant. *See Murray*, 906 P.2d at 567. When apprehended, Roger had blood on his clothes which was not his, but which could have come from either victim. *See id.* at 555. Roger also discarded a loaded .25 caliber gun immediately prior to his arrest, which was consistent with the fired .25 caliber shell found at the crime scene. Roger's footprints were left at the crime scene, *see id*. at 554, and the brothers possessed items stolen from Grasshopper Junction, including rolled coins stamped with the name and location of the store, and a cushion cover from the couch that contained blood and tissue from Applehans. *See id.* at 554-55. This and additional evidence tending to show that Roger intended to take life, or intended that lethal force be used, support much more than a mere inference that Roger was just a person in a car waiting to help the actual robbers escape. Therefore, the Arizona Supreme Court's ruling that this record did not warrant a lesser included offense instruction was not contrary to or an unreasonable application of Supreme Court precedent.

## G. Claim Twenty-Six - Failure to Appropriately Consider Mitigating Evidence

Roger argues that the trial court erroneously determined that his dysfunctional childhood could not be considered as an independent mitigation factor. Specifically, Roger asserts

that the state court misapplied *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982), and its progeny by requiring a nexus between the mitigation evidence and commission of the crimes. Stated differently, Roger contends that the Arizona court required Roger to demonstrate that the childhood experiences offered in mitigation contributed to his commission of the crimes.

The state counters that Roger did not raise this issue before the state court, and as a result, it is procedurally barred. However, Roger raised this issue in his direct appeal when he argued that the trial court failed to objectively consider his mitigation evidence. The Arizona Supreme Court rejected Roger's claim, finding that the sentencing court reviewed all of the mitigating evidence, but deemed it insufficient to outweigh the aggravating factors. *See Murray*, 906 P.2d at 578–79. Roger now renews his argument that the Arizona Supreme Court unconstitutionally applied the causal nexus test. Roger relies on the portion of the Arizona Supreme Court's decision addressing the trial court's finding that Roger's childhood was dysfunctional, and concluding that "he fail[ed] to show how this background impacted his behavior at Grasshopper Junction." *Murray*, 906 P.2d at 577.

Citing *Styers v. Schriro*, 547 F.3d 1026 (9th Cir. 2008), Roger contends that the Arizona Supreme Court's analysis of the trial court's weighing is contrary to United States Supreme Court authority from *Smith v. Texas*, 543 U.S. 37 (2004), and related cases.

Under clearly established Supreme Court authority, a state court may not treat mitigating evidence of a defendant's character or background "as irrelevant or nonmitigating as a matter of law" simply because it does not have a causal

connection to the crime. *Towery v. Ryan*, 673 F.3d 933, 946 (9th Cir. 2012) (per curiam); *see also Penry v. Lynaugh*, 492 U.S. 302, 318 (1989) (citing *Eddings*, 455 U.S. at 114 and holding that a state cannot, "consistent with the Eighth and Fourteenth Amendments, prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty"), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002). On the other hand, the sentencer may consider "causal nexus . . . as a factor in determining the weight or significance of mitigating evidence. . . ." *Lopez v. Ryan*, 630 F.3d 1198, 1204 (9th Cir. 2011) (citing *Eddings*, 455 U.S. at 114–15) (footnote reference omitted).

In determining whether the state court used a causal nexus analysis as an impermissible screening mechanism or as a permissible weighing tool, we must presume the latter "[a]bsent a clear indication in the record" that the state court "violated *Eddings*'s constitutional mandates." *Schad v. Ryan*, 671 F.3d 708, 724 (9th Cir. 2011), *as amended* (citing *Bell*, 543 U.S. at 455); *see also Poyson v. Ryan*, No. 10-99005, __F.3d__, 2013 WL 5943403, at *11 (9th Cir. Nov. 7, 2013), *as amended* (denying relief on a causal nexus claim when ambiguity existed regarding "whether the [state] court considered the absence of a causal nexus as a permissible weighing mechanism . . ., or as an unconstitutional screening mechanism"). This presumption applies not only when we are drawing inferences from a state court's silence, but also when we are interpreting a state court's ambiguous statement. *See Woodford v. Viscotti*, 537 U.S. 19, 22–24 (2002). The cases Murray relies on, *Smith* and *Styers*, are consistent with these principles. The Supreme Court in *Smith* rejected the causal nexus requirement between a petitioner's mitigation

factors and the crime.  *See Smith*, 543 U.S. at 45 (focusing on whether the factfinder "consider[ed] and g[a]ve effect to a defendant's mitigation evidence in imposing sentence") (citations, alterations and internal quotation marks omitted). In *Styers*, we similarly held that the state court's application of the causal nexus test to mitigating evidence was "contrary to the constitutional requirement that all relevant mitigating evidence be considered by the sentencing body. . . ." *Styers*, 547 F.3d at 1035 (citing *Smith*, 543 U.S. at 45).

After closely reviewing the record, the Arizona Supreme Court found that the trial court considered all of the mitigating evidence and explained in painstaking detail in special verdicts why the mitigating evidence did not outweigh the aggravating factors.  *See Murray*, 906 P.2d at 571–79 (discussing the mitigation evidence).  Roger's claim that the trial court failed to properly weigh his mitigating evidence is not supported by the record.  *See id.*  The Arizona Supreme Court, in reviewing the trial court's weighing of mitigating and aggravating factors, discussed in detail Roger's claim that he was a troubled youth, citing information regarding his confinement in a juvenile detention center.  *See id.* at 574. The court acknowledged that a counselor at the detention center identified Roger's need of help to manage his anger and emotional issues.  *See id.*  The court noted that a sociologist testified during his sentencing hearing that Roger's problems as a youth stemmed from neglect at home and by government officials.  *See id.*  However, the court also discussed that the sociologist testified that Roger knew killing was wrong.  *See id.*  Additionally, the court noted that Roger suffered from head injuries and was diagnosed with attention deficit/hyperactivity disorder.  *See id.* at 574–75.  Further, the court discussed Roger's use of alcohol and illicit drugs.  *See id.* at 575–76.  Nevertheless, the court concluded that

although his dysfunctional childhood, head injuries, hyperactivity, and alcohol/drug use were mitigating factors, these factors had negligible mitigating force because Roger did not show how they affected his behavior on the night of the murders. *See id.* at 577.

Taken in the full context of the Arizona Supreme Court's exhaustive analysis, there is no "clear indication in the record," *Schad*, 671 F.3d at 724, that its statement that Roger "fail[ed] to show how this [family] background impacted his behavior at Grasshopper Junction," *Murray*, 906 P.2d at 577, amounted to an impermissible screening mechanism under *Eddings*." *See Lopez*, 630 F.3d at 1204 (emphasizing that "we must look to what the record actually says" and that where "the state court made clear that it considered all the mitigating evidence and found it wanting," we cannot "infer unconstitutional reasoning").

Even if we assume the Arizona Supreme Court did commit causal nexus error with respect to Roger's troubled childhood, the error was harmless and we would still deny his claim for relief. *See Stokley v. Ryan*, 705 F.3d 401, 404 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)) (explaining that a non-structural error requires reversal only if it "had substantial and injurious effect or influence in determining the . . . verdict"). Under *Stokley*, where the appellate court reviews all of the mitigating and aggravating factors individually, and confirms the trial court's determination that there are no grounds substantial enough to warrant leniency, the appellate court's *Eddings* error with respect to a relatively minor mitigating factor does not create a "reasonable likelihood that, but for a failure to fully consider [that factor], the [state] courts would have come to a different conclusion. . . ." 705 F.3d at 405 (citation

omitted).   Thus, in *Stokley* we concluded that the Arizona
Supreme Court's *Eddings* error, if any, with respect to family
history or good behavior while imprisoned, was harmless.
*See id*.    Here, as in *Stokley*, after "review[ing] and
discuss[ing] each of the aggravating and mitigating factors
individually," *id*. at 404, the Arizona Supreme Court agreed
with the trial court that Roger's mitigation evidence was
minimal "at best" and that there was certainly "no mitigating
evidence sufficiently substantial to call for leniency. . . ."
*Murray*, 906 P.2d at 579.   Therefore, any *Eddings* error with
respect to the effect of Roger's troubled childhood does not
raise a reasonable likelihood that fuller consideration of that
relatively minor factor would have led the Arizona courts to
reach a different conclusion.   In other words, Roger "cannot
demonstrate actual prejudice because he has not shown that
the error, if any, had a substantial and injurious impact on the
verdict. . . ."  *Stokley*, 705 F.3d at 404.

In sum, the Arizona Supreme Court's decision was not
contrary to or an unreasonable application of Supreme Court
precedent, because the record reflects that the sentencing
court, as the factfinder, employed the causal nexus test as a
permissible means of weighing the entirety of Murray's
mitigation evidence prior to imposing his sentence.  *See Bell*,
543 U.S. at 455.   Even if there were a causal nexus error
under *Eddings*, Roger cannot establish prejudice and we must
deny his claim for relief in any event.  *See Stokley*, 705 F.3d
at 404 (citing *Brecht*, 507 U.S. at 623).

### H.  Claim Forty-Four - Denial of Request to Replace Counsel Due to Irreconcilable Conflict

Roger asserts that his Sixth Amendment right to counsel
was violated because of an irreconcilable conflict with his

counsel. Roger argues that his claim is not procedurally barred, because he raised the issue to the Arizona Supreme Court and in his PCR petition. The state counters that this issue is procedurally barred as determined in the PCR court's decision dated January 10, 2000. We need not resolve this procedural point, because to the extent Roger argues that his claim may be resurrected under *Martinez*, habeas relief is not warranted. Roger might be entitled to a remand under *Martinez* if he could establish that his PCR counsel was ineffective for failing to raise the irreconcilable conflict asserted by Roger, and that the underlying IAC claim is "substantial." *Sexton v. Cozner*, 679 F.3d 1150, 1157 (9th Cir. 2012), *as amended*. We examine the record to determine whether Roger has made the required showing of ineffectiveness of PCR counsel. *See id.* To do so, Roger must establish that his trial counsel's performance was deficient and that he was prejudiced as a result. *See id.*; *see also Strickland*, 466 U.S. at 687 (articulating standard for ineffective assistance of counsel claim). To demonstrate that the performance by PCR counsel was deficient, Roger must show that counsel's failure to raise the underlying IAC claim did not "fall[ ] within the wide range of reasonable professional assistance" and "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . ." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted). Prejudice is shown by evidence of a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694. Here, Roger would have to establish that the outcome of his PCR proceedings would have been different.

If there is a failure of proof on either prong, habeas relief is not warranted. *See Gentry v. Sinclair*, 705 F.3d 884, 899 (9th Cir. 2013), *as amended*. A defendant's disagreement with trial counsel's strategy does not constitute deficient performance on the part of trial counsel. *See Strickland*, 466 U.S. at 689–91; *see also Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006). Additionally, to demonstrate an irreconcilable conflict, Roger must establish that there was a complete breakdown of communication that substantially interfered with the attorney-client relationship. *See United States v. Mendez–Sanchez*, 563 F.3d 935, 943 (9th Cir. 2009).

At the hearing held in response to Roger's request to terminate his attorneys, Roger confirmed his wish to end his relationship with his attorneys due to a conflict of interest. Roger's trial counsel explained to the court that there was an irreconcilable difference of opinion regarding the strategy for the penalty phase proceedings. The trial court ultimately granted Roger's motion to represent himself and allowed an attorney from the public defender's office to remain as advisory counsel. One week later, Roger filed a motion requesting appointed counsel. Counsel from the public defender's office informed the trial court that an ethical conflict remained due to the office's representation of Roger and another client with an adverse interest who was to testify in response to a prospective witness for Robert's case. Counsel also reminded the court about the conflict between counsel and Roger regarding strategy for the penalty phase. Counsel suggested to the court that another attorney represent Roger. The court reviewed the suggestion and reappointed counsel from the public defender's office, with Roger agreeing. The conflict presented to the trial court by Roger concerned strategy for the penalty phase. This issue implicates attorney strategy rather than irreconcilable

conflict. Thus, Roger failed to establish that his claim of irreconcilable conflict was of sufficient merit to substantiate a claim of ineffective assistance of counsel.[14] *See Sexton*, 679 F.3d at 1156–57 (explaining that a defendant cannot establish that counsel's performance fell below an objective standard of reasonableness when the only disagreement concerned strategy); *cf. Daniels v. Woodford*, 428 F.3d 1181, 1199–1200 (9th Cir. 2005) (recognizing an irreconcilable conflict where there was a complete lack of communication between attorney and client).

Roger failed to establish that the conflict between his counsel and him was indeed irreconcilable. *See Mendez-Sanchez*, 563 F.3d at 943 (noting that defendant's relationship with counsel did not rise to the level of irreconcilable conflict when the conflict was generated from defendant's general unreasonableness). Therefore, the PCR counsel's performance was not deficient. Because Roger did not establish that his conflict with counsel was irreconcilable, his ineffective assistance of counsel claim lacks sufficient merit to warrant a *Martinez* remand.[15] *See Sexton*, 679 F.3d at

---

[14] The Arizona Supreme Court interpreted this issue as a request for hybrid representation and ruled that the trial court did not abuse its discretion when it denied Roger's request. *See Murray*, 906 P.2d at 560–61. Although its conclusion was couched in the context of hybrid representation, the Arizona Supreme Court addressed Roger's assertion of irreconcilable differences and affirmed the trial court's reappointment of counsel from the public defender's office. *See id.*

[15] In the alternative, Roger contends that the district court erred in not addressing his motion to amend his petition to include this claim. Roger relies on the Second Circuit's decision in *Littlejohn v. Artuz*, 271 F.3d 360 (2d Cir. 2001). However, *Littlejohn* is not binding precedent in this circuit. More importantly, any failure to address Roger's request for leave to amend was harmless in view of the lack of merit to his claim. *See*

1156–57 (noting that an IAC claim must be substantial to warrant a *Martinez* remand and that disagreement regarding strategy does not constitute ineffectiveness of counsel); *but see Detrich v. Ryan*, 740 F.3d 1237, 1248 (9th Cir. 2013) (W. Fletcher, J., plurality) (explaining that in most cases, *Martinez* motions should be remanded to the district court for a decision in the first instance).

## I.  Claim Forty-Five - Ineffective Assistance of Trial Counsel Due to Counsel's Inattentiveness

Roger contends that he was denied the effective assistance of counsel, because his counsel slept during substantial portions of his trial.  Roger further asserts that his evidentiary hearing regarding this issue violated due process, because the judge presiding at his trial was also the presiding judge at his PCR hearing.

The Sixth Amendment guarantees the accused the "right to the effective assistance of counsel."  *United States v. Cronic*, 466 U.S. 648, 655–56 (1984).  The Supreme Court "has concluded that the assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'"  *Holloway v. Arkansas*, 435 U.S. 475, 489 (1978) (citing *Chapman v. California*, 386 U.S. 18, 23 (1967)).  Moreover, "when a defendant is deprived of the presence and assistance of his attorney, either throughout the prosecution or during a critical stage in, at least, the prosecution of a capital offense, reversal is automatic."  *Id.* (citations omitted).  We have held that when counsel sleeps through a substantial portion of a trial,

---

*Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995) (noting that denial of leave to amend is appropriate if amendment would be futile).

his client has been deprived of effective legal assistance, resulting in inherent prejudice. *See Javor v. United States*, 724 F.2d 831, 833–34 (9th Cir. 1984). Roger relies solely on our decision in *Javor* to support his claim. Nevertheless, Roger's reliance on *Javor* is misplaced. *Javor* is a pre-AEDPA case that was crafting a rule from existing Supreme Court precedent. *See id*. We reiterate that our circuit precedent is only relevant to the extent that, "in accordance with [our] usual law-of-the-circuit procedures, . . . [we] ha[ve] already held that the particular point in issue is clearly established by Supreme Court precedent . . . ." *Marshall*, 133 S. Ct. at 1450 (citations omitted). As such, *Javor* is inapposite to our analysis on federal habeas review.

The last reasoned state court decision addressing this claim was the PCR court's order dated March 21, 2002. After a two-day hearing including witness testimony, the PCR court concluded that Roger's counsel did not actually sleep during the trial. Robert's trial counsel testified that Roger's trial counsel had a reputation for "dozing off" in court. She stated that she personally observed Roger's counsel "in a posture that look[ed] like he's asleep." However, she admitted that she was not sure at times whether he was dozing or just listening with his eyes closed. Robert's counsel did not contemporaneously inform the trial court of her observations.

A former juror testified that she vaguely remembered Roger's lawyer nodding off during the trial. During cross-examination, she conceded that Roger's counsel did not close his eyes for long periods of time, and that she would have informed a bailiff if Roger's counsel had been asleep for significant portions of the trial.

Roger's appellate counsel testified that Roger specifically told her that his trial counsel appeared to doze during trial. She also mentioned that she did not raise the issue of Roger's trial counsel sleeping, because it was not part of the record on direct appeal.

Roger's trial counsel testified that he remembered Roger complaining about him sleeping during jail visits, but not during trial. He did not remember sleeping during the trial. The PCR court directly questioned Roger's trial counsel, asking explicitly whether he slept during the trial. In reply, Roger's counsel stated: "Your Honor, quite frankly, I can't say. I wouldn't be the one to really know that. I don't think I did, but there is a possibility I did. But it would have been basically just a few seconds more than anything else. A cat nap type thing." He did not admit to sleeping. The PCR court then recalled on the record that Roger's trial counsel appeared generally to be "fired up" during the cases he had tried before the judge. Trial counsel agreed that he indeed was typically "fired up" for his cases and that he had "tried to give [Roger's trial] more because of the importance of it."

Roger testified that he observed his trial counsel asleep first at the jail and then almost daily during trial. During the testimony of Detective Lent, the footprint expert, Roger observed his trial counsel asleep for four to five minutes. Roger also observed his trial counsel sleeping during the medical examiner's testimony. Roger remembered his trial counsel sleeping through other witnesses as well. Roger recalled that he informed his other trial counsel and his appellate counsel about his observations. Roger did not inform the trial court about his observations.

During cross-examination, the state reviewed the trial transcript with Roger, specifically emphasizing witness testimony where Roger had testified that his counsel was asleep. The state consistently established that Roger's trial counsel was engaged during the witness testimony that Roger previously associated with his counsel's sleeping. Roger admitted during cross-examination that he did not specify in his affidavit precisely when his trial counsel was sleeping.

The prosecutor testified that Roger's trial counsel appeared engaged and active during trial. The prosecutor observed Roger's trial counsel listening with his eyes closed. According to the prosecutor, Roger's trial counsel had a habit of closing his eyes when he was thinking, and he would nod occasionally, but when a response was required he would seamlessly open his eyes and respond appropriately, appearing to be completely engaged.

Neither the bailiff nor the investigator remembered Roger's trial counsel sleeping during the trial. The same was true for co-counsel. Co-counsel did not observe Roger kicking his trial counsel or trial counsel falling asleep during trial. Neither did co-counsel recall Roger speaking to him about trial counsel falling asleep during trial.

After oral argument and after reviewing briefs from both counsel, the PCR court entered a minute order denying relief. The PCR court acknowledged that Robert's trial counsel and a former juror testified to observing Roger's trial counsel sleeping during portions of the trial. However, the PCR court noted that other witnesses and the trial transcript undermined this testimony. The PCR court found that the trial transcript reflected that Roger's trial counsel was "actively engaged in the trial." The PCR court credited the testimony of trial

counsel that he did not recall sleeping during the trial. In addition, the PCR court found the testimony of the prosecutor, the investigator, and the bailiff more credible. Each of these three witnesses denied ever seeing Roger's trial counsel asleep during the trial. The PCR court was also persuaded by co-counsel's testimony that Roger never complained to co-counsel about trial counsel sleeping.

We cannot conclude that the PCR court's rejection of Roger's claim was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2). Indeed, the record of the trial proceedings confirms the reasonableness of the PCR court's finding that Roger's counsel was not asleep during the trial. Most telling was the state's demonstration from the transcripts that counsel was actively questioning witnesses and objecting to testimony at times when Roger accused counsel of being asleep. *See Hibbler v. Benedetti*, 693 F.3d 1140, 1148–50 (9th Cir. 2012) (concluding, after reviewing the evidence presented in state court, that the state court's determination was not unreasonable). Because Roger's *Strickland* claim hinges on the fact that his counsel slept through substantial portions of trial, which the record does not support, we conclude that the state court did not unreasonably apply clearly established Supreme Court precedent. We affirm the district court's denial of relief on this claim.

The Arizona Supreme Court's rejection of Roger's claim that he was denied a full and fair hearing also was not contrary to, or an unreasonable application of clearly established Supreme Court precedent. We have stated that "[i]t has long been regarded as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant. . . ."

*Gerlaugh v. Stewart*, 129 F.3d 1027, 1036 (9th Cir. 1997) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)). There must be more than "the false assumption that trial judges are not capable of doing what the law requires" to justify the requirement that a different judge hear subsequent proceedings. *Id*. The Supreme Court has also recognized that "knowledge (and the resulting attitudes) that a judge properly acquired in an earlier proceeding [is] *not* . . . 'extrajudicial'. . . . [T]rial *rulings* have a judicial *expression* rather than a judicial *source*. They may well be based upon extrajudicial knowledge or motives. . . ." *Liteky*, 510 U.S. at 545 (citations omitted) (emphases in the original).

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant, who has been shown to be a thoroughly reprehensible person. But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings, and are indeed sometimes (as in a bench trial) necessary to completion of the judge's task. As Judge Jerome Frank pithily put it: "Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions." Also not subject to deprecatory characterization as "bias" or "prejudice" are opinions held by judges as a result of what they learned in earlier proceedings. It has long been regarded as normal and proper for

> a judge to sit in the same case upon its
> remand, and to sit in successive trials
> involving the same defendant.

*Id*. at 550–51 (citations omitted).

Roger has not identified any Supreme Court case holding that a defendant is deprived of due process when the trial judge presides over post-conviction proceedings. Rather, the opposite is true. *See id*.; *see also Cook v. Ryan*, 688 F.3d 598, 612 (9th Cir. 2012) (noting that the trial judge was "ideally situated" to make an assessment of the facts when resolving post-conviction issues) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 476 (2007)). The distinction is plain. As a fact witness, the judge would be seeking to persuade the finder of fact to a certain view of the evidence. As the presiding jurist, the judge is the factfinder, with absolutely no incentive to shade the facts one way or the other. *See*, *e.g.*, Fed. R. Evid. 605 (providing that the presiding judge may not testify as a witness in the trial over which he presides); *see also United States v. Berber-Tinoco*, 510 F.3d 1083, 1091 (9th Cir. 2007) (holding that a trial court judge is not a competent witness to factual matters in a case over which he presides). No similar conundrum exists when the trial judge presides over post-conviction proceedings. In the post-conviction proceedings, the judge functions as a reviewer of the trial proceedings rather than as a chronicler of the facts. As the Supreme Court has explained, the trial judge's unique knowledge of the trial court proceedings renders him "ideally situated" to review the trial court proceedings. *Landrigan*, 550 U.S. at 476. Roger's due process rights were honored in full. Serving as an adjudicator rather than as a witness, the PCR court determined that Roger's claim lacked merit.

In this case, the only evidence that Roger puts forward is that the judge stated: "I guess I have to tell you I remember some things about this trial very well . . . and I–I never saw [Roger's trial counsel] asleep." Roger relies upon this statement to demonstrate that the trial judge "was a key and biased witness who did not testify but ruled on the motions while his own observations were not subject to cross-examination." It is important to consider the trial judge's full comments:

> Well, I guess–I guess I have to tell you I remember some things about this trial very well. And one was that [Roger's trial counsel] was very aggressive, very emphatic and–but of course you know–and I–I never saw him asleep. But, you know, I guess I'll let you have an opportunity to show me that he was sleeping during substantial portions of the trial because we have the Affidavits that say he was. But I have to tell you, I'm skeptical about that because I remember how aggressive he was–aggressively he argued when we were off the record, and even when we were on the record, the objections in the case.

> So, I guess I'll set that–that one I think probably should be set for an evidentiary hearing, because you know, it's–it's certainly not something that was on the record and certainly not something that I noticed. So number four we'll set for evidentiary hearing.

Read in the context of the judge's full statement, Roger's claim is unfounded. The judge stated that his recollection was that Roger's trial counsel was very aggressive and involved and that he had no memory of Roger's trial counsel sleeping. Rather than merely denying the claim based upon his own recollection, however, the judge elected to hold an evidentiary hearing because "we have the Affidavits that he was [sleeping]." This situation is no different from a situation where a judge retains unexpressed recollections of trial matters and presides over an ensuing evidentiary hearing. In that vein, the judge's articulated skepticism does not provide a basis for Roger's claim of judicial bias because the judge's "knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings. . ." *Liteky*, 510 U.S. at 551. Therefore, the Arizona Supreme Court's rejection of Roger's Sixth Amendment claim of judicial bias was not contrary to or an unreasonable application of clearly established Supreme Court precedent.

Finally, Roger asserts that he is entitled to an evidentiary hearing to develop this claim. However, because we review Roger's claim under § 2254(d) rather than *de novo*, Supreme Court precedent bars him from receiving an evidentiary hearing. *See Pinholster*, 131 S.Ct. at 1398 (directing that habeas claims under AEDPA be resolved on the record before the state court).

### J. Claim Forty-Eight - Ineffective Assistance of Trial Counsel Based on Counsel's Failure to Present an Exculpatory Witness

Roger contends that his counsel was ineffective because he "never bothered to interview [a] critical witness. . . ."

According to Roger, the witness, John Anthony (Anthony) was located by Robert's attorney's investigator approximately one week before trial. Roger complains that despite the discovery of this critical witness, his trial counsel failed to interview the witness, depose him, call him to testify, or request a continuance. Roger asserts that his trial counsel had "no strategic reason for not calling [the witness] directly." Failure to call this witness, Roger argues, resulted in the absence of evidence tending to implicate others and suggesting that he was not present at the scene of the crime. Roger maintains that any reasonable attorney would have called this witness.

The state PCR court's denial of this claim did not provide a reasoned explanation. *See Richter*, 131 S. Ct. at 784 (recognizing that AEDPA "does not require that there be an opinion from the state court explaining the state court's reasoning. . . .") (citations omitted). We can, however, look through to the evidentiary hearing and oral argument during which the PCR judge articulated the reasons for his later summary reiteration of his previous decision denying Robert's identical claim. In this situation, "'whe[re] the state court does not supply reasoning for its decision,' we are instructed to engage in an 'independent review of the record' and ascertain whether the state court's decision was 'objectively unreasonable.'" *Walker*, 709 F.3d at 939 (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)). "Crucially, this is not a *de novo* review of the constitutional question. Rather, 'even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" *Id*. (citations omitted).

Through an evidentiary hearing on Robert's identical claim, the PCR court learned that Anthony, the allegedly

exculpatory witness, purportedly witnessed a blue car parked outside the Grasshopper Junction store on the same night as the murders. Anthony informed the prosecution's investigator that he thought he saw the victim Morrison with three men, none of whom resembled Robert.[16] Anthony's testimony would have supported the defense's theory of the case, that Roger and Robert happened to be at Grasshopper Junction, but did not commit the murders. Robert's trial counsel informed the court that neither she nor her investigator were able to contact Anthony, which is why he was never called as a witness. Although her investigator discovered that Anthony was in a Veterans Administration treatment center in California, the investigator was never able to make contact with Anthony.

The PCR court found that Robert's trial counsel had investigated the exculpatory witness to the best of her ability. The PCR judge stated: "We don't have any proof that the witness would have said what's in the report. We still haven't found the witness." The PCR judge recalled that, as trial judge, he would not have granted a continuance for further investigation, and had to believe that both Robert's trial counsel and Roger's trial counsel were still trying to find Anthony through the end of the case. The PCR court found that Robert's counsel was not deficient in her performance, and that even if she were deficient, the outcome of the trial would not have changed.

At the oral argument of Roger's identical claim, the PCR judge indicated that he had already heard and considered evidence from Robert regarding this exact claim, resulting in denial of Robert's claim. The judge explained that he denied

---

[16] This is the same exculpatory witness to whom Roger refers.

Robert's identical claim because the evidence had established that the witness was unavailable–he could not be located. And, even if he had been located just prior to trial, counsel could not have "gotten him [to court] as a witness." This evidence before the state court "was sufficient to resolve the factual question" whether Roger's counsel performed deficiently, and thus the PCR court's failure to hold an evidentiary hearing on the issue did not "render its fact-finding process unreasonable," *Hibbler*, 693 F.3d at 1147. Because Roger did not demonstrate that his trial counsel had performed deficiently, the PCR court's rejection of Roger's claim was not contrary to established Supreme Court precedent. *See Strickland*, 466 U.S. at 687.

Before us, Roger argues that the trial judge erred by not holding a separate evidentiary hearing before resolving his identical claim. However, Roger failed to adduce any evidence raising a question regarding the actual availability of the witness, or regarding a lack of diligence by his counsel in attempting to locate the witness. Roger merely stated:

> [My] position is that any reasonably effective criminal defense lawyer would have seen that he was a crucial witness at trial, would have located him, would have found him, would have subpoenaed him, would have had him in court and would have had him testify. [Trial counsel] didn't do any of those things, period.

Absolutely no evidence was presented to the PCR court to substantiate Roger's assertions. Only speculation was offered. Specifically, Roger asked for funds so he could:

find Mr. Anthony nine years after the fact so [he could] present Mr. Anthony to [the PCR court] so that [the PCR court could] live and in color hear Mr. Anthony, hear his testimony, evaluate his credibility, and then make a determination whether if called by an effective counsel Mr. Anthony could have made a difference.

After considering Roger's speculative proffer, the PCR judge had no reason to hold another evidentiary hearing, especially in view of the PCR judge's recognition that "there's absolutely no proof at all that [Anthony] was available for the trial."

Critical to the PCR judge's decision was the fact that "even if [Roger's counsel] was incompetent, it would not have made a difference as far as the verdict was concerned. So it would not have made a difference. . . ." Thus, it fairly appears that the judge found the evidence of guilt so overwhelming that any testimony Anthony could have given would not have resulted in a different verdict. In other words, Roger could not establish *Strickland* prejudice. Ultimately, after evaluating the evidence presented during Robert's evidentiary hearing and Roger's failure to proffer any further relevant evidence, the PCR court summarily denied Roger's claim of ineffective assistance of counsel.

The district court denied Roger's request for an evidentiary hearing, and agreed with the factual findings made by the state court. The district court correctly denied a federal evidentiary hearing because federal habeas review is limited to the record before the state court. *See Pinholster*, 131 S. Ct. at 1398–1400. Viewing that record, the district

court explained that to grant habeas relief, the reviewer would have to find that the jury would have believed the defense's theory that Robert and Roger burglarized the victims' store and home after finding the victims already dead. In support of this theory, Roger relied on Anthony's statement regarding the three men he observed at the store who did not resemble Robert and Roger and who drove a different car; a statement from Angela Anthony that she heard a man threaten one of the victims the day prior to the murders; and proffered testimony from an unidentified witness that Robert and Roger were elsewhere when the three men were spotted at the store. Roger relies most heavily on the statement of John Anthony as the basis for his IAC claim.

The state court determined that Roger's counsel was not ineffective in this respect, and the state court's determination was not contrary to, or an unreasonable application of, *Strickland* or other Supreme Court precedent. To establish ineffective assistance of counsel the petitioner must hurdle an extremely high bar. *See Richter*, 131 S. Ct. at 788. *Strickland* provides the legal standard for assessing a claim of ineffective assistance of counsel on habeas review. *See* 466 U.S. at 685–87.

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial

> whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687.

To meet the first prong "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 688. This inquiry is "highly deferential." *Id*. at 689; *see also Richter*, 131 S. Ct. at 788. When *Strickland*'s standards are coupled with the provisions of AEDPA, review is "doubly deferential." *Richter*, 131 S. Ct. at 788. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . ." *Strickland*, 466 U.S. at 691. Reasonableness is viewed as of the time of the conduct and against the background of the facts of the case. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005). The duty to investigate does not require "defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. . . ." *Id*. at 383 (citations omitted).

The second prong requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The question for a reviewing court applying *Strickland* together with the § 2254(d) overlay is whether there is a "reasonable argument that counsel

satisfied *Strickland's* deferential standard," such that the state court's rejection of the IAC claim was not an unreasonable application of *Strickland*. *Richter*, 131 S. Ct. at 788. Relief is warranted only if no reasonable jurist could disagree that the state court erred. *See Pinholster*, 131 S. Ct. at 1402.

Even on *de novo* review, Roger's IAC claim falters on both prongs of the *Strickland* standard. Counsel was not deficient, and Roger suffered no *Strickland* prejudice. As discussed, the PCR court held an evidentiary hearing before resolving Robert's IAC claim predicated on his counsel's failure to produce John Anthony as a witness. The record reflects that the exculpatory witness was not available and that Robert's counsel made a reasonable effort to locate and present the witness. Counsel's performance was not deficient in view of her reasonable investigatory efforts. *See Rompilla*, 545 U.S. at 382–83. We also agree with the district court that the overwhelming evidence of guilt forecloses any credible argument that the outcome of the trial would have been affected by the proffered exculpatory evidence. To acquit Robert and Roger, the jury would have had to believe that the brothers found the victims already dead and got the victims blood on their clothes while burglarizing the store and the residence. This scenario, by the way, was totally inconsistent with the facts that the male victim's wallet containing $800 was left undisturbed in his pants pocket, and that $172 was found on a chair. The implausibility of the proffered exculpatory version of events and the strength of the inculpatory evidence both bolster the state court's finding under the doubly deferential AEDPA review applicable to IAC claims. *See Richter*, 131 S. Ct. at 787–88. Because even under *de novo* review the state court's denial of Roger's IAC claim that parroted Robert's claim was not contrary to or an

unreasonable application of *Strickland*, Roger's claim fails. *See id.*

## IV. SUMMARY

We agree with the district court's conclusion that Roger was not entitled to habeas relief on any of the certified claims because the state court's rejection of these claims was not contrary to or an unreasonable application of AEDPA. Even though this sensational, small-town murder understandably generated substantial media coverage, the state court's decision that the coverage was not constitutionally prejudicial was not contrary to or an unreasonable application of Supreme Court precedent. Similarly, the state court's rejection of Roger's challenge to the jury venire was not contrary to or an unreasonable application of Supreme Court precedent. Acceptance of the prosecutor's race-neutral explanations for the exercise of his peremptory challenges was not contrary to or an unreasonable application of *Batson.* Because the Supreme Court has eschewed claims predicated on the unavailability of immaterial evidence, the state court's denial of Roger's belated request to inspect a sanitized crime scene was also not contrary to, or an unreasonable application of, Supreme Court precedent.

The evidence in the record did not support Roger's request for jury instructions on voluntary intoxication and second degree murder. The state court's denial of relief was consistent with Supreme Court precedent.

As the Arizona Supreme Court detailed, the sentencing court meticulously weighed the mitigating circumstances against the aggravating factors before imposing a death

sentence. Its determination was not contrary to or an unreasonable application of Supreme Court precedent.

The Arizona Supreme Court's decisions denying relief on the claims of ineffective assistance of counsel were not contrary to or an unreasonable application of *Strickland*, particularly in view of the double deference applicable to AEDPA claims of ineffective assistance of counsel. The district court correctly resolved the claims on the evidence presented to the state courts. No cognizable *Martinez* claim was asserted. We affirm the denial of habeas relief as to all certified claims.

**AFFIRMED.**